708 P.2d 719

**STATE of Arizona, Appellee,**

v.

**Paul Clyde LESLIE, Appellant.**

**No. 5806–2.**

Supreme Court of Arizona,
In Banc.

Oct. 9, 1985.

Robert K. Corbin, Atty. Gen. by William J. Schafer III and Georgia Ellexson, Asst. Attys. Gen., Phoenix, for appellee.

Ross P. Lee, Maricopa County Public Defender by Dennis Dairman and James Edgar, Deputy Public Defenders, Phoenix, for appellant.

CAMERON, Justice.

Defendant, Paul Clyde Leslie, was convicted and adjudged guilty of first degree murder, A.R.S. § 13–1105. He was sentenced to death pursuant to A.R.S. § 13–703. We have jurisdiction pursuant to Ariz. Const. art. 6, § 5(3) and A.R.S. §§ 13–4031 and –4035.

We must decide the following issues:

1. Did the trial court properly find that the police had probable cause to arrest defendant?

2. Was defendant denied his right to a speedy trial pursuant to the sixth amendment of the United States Constitution?

3. Did the trial court err in charging the jury by:

 a. failing to give a requested *Willits* instruction;

 b. failing to give defendant's requested instruction that burglary is a lesser-included offense of felony murder;

 c. failing to inform the jury that no unfavorable inference could be drawn from the failure of a witness to testify?

4. Was the death penalty properly imposed?

The facts follow. On 2 April 1981, the victim, Mrs. Mary V. Rabb, age 70, lived alone in Phoenix, Arizona. One of her neighbors had seen and talked with her that morning at around 7:00 A.M. when the two of them went for a brief walk. Rabb returned home at approximately 7:10. Sometime between 11:00 and 12:00 noon, the two women who lived next door to her noticed that her dog was running loose outside. Because this was unusual, they went to her house to see if everything was all right. Rabb did not come to the door when they knocked and they noticed that her car, a new white Oldsmobile, was gone. They returned to the house at 5:00 P.M., this time entering the premises. Mrs. Rabb's dead body was discovered in the garage. She had been hit approximately twenty times around her head resulting in her death. Several rugs were covering the victim's body and there was a small, blood-stained ax found in the garage.

On the morning of April 2, 1981, defendant went to the Biltmore Gold and Silver, located several miles from the victim's home, and attempted to pawn several pieces of the victim's silver. When the owner of the store asked for his car registration, defendant left the store and drove away in a new white Oldsmobile, leaving behind the silver and his driver's license. Shortly after noon, defendant picked up two women hitchhikers at 35th Avenue and Buckeye Road. He was wearing women's shoes. One of the women took from the console between the two front seats a ring which was later determined to belong to the victim.

Defendant and his two passengers drove west toward California. When officers at Hope, Arizona, in what was then Yuma County, Arizona, attempted to arrest him for speeding, he exited the freeway, stopped at a gas station, got out of the car and ran, leaving the two women behind. The officers impounded the car and ascertained that it belonged to the victim. Several hours later, defendant was arrested.

At trial, defendant took the stand on his own behalf. He admitted having stolen the silver from Mrs. Rabb's house but denied killing her. He stated that he never saw her that day. He also stated, without offering an explanation, that he had put on one of her shirts and a pair of her shoes. The police were unable to find the shirt and shoes that he discarded. Defendant was found guilty by a jury on 9 February 1984. From his conviction and sentence, he appeals. He also filed for review of the denial of his petition for post-conviction relief pursuant to Rule 32, Ariz.R.Crim.P., 17 A.R.S. We consolidated the two matters for determination.

## THE ARREST

Defendant first argues that the trial court erred in failing to grant the motion to suppress evidence obtained as a result of his illegal arrest.

On 2 April 1981 at 2:45 P.M., D.P.S. Officer Brad Watkins saw a white 1981 Oldsmobile sedan containing at least two people travelling on Interstate 10 near Hope in the Salome-Vicksburg-Wenden area of Yuma County, Arizona. Because the car was exceeding the speed limit, the officer attempted to pull it over. The car exited at Vicksburg Road and stopped at an Arco gas station. When the officer caught up with the vehicle, he saw two women who were attempting to run. He stopped them and they informed him that the car had been driven by a dark haired Mexican or Oriental male, standing approximately 5'8" and wearing dark clothing. The officer ran a license check on the car and determined that it was registered to the victim. The car had not, at that time, been reported stolen. Sergeant Harold and Deputy Pearson of the Yuma County Sheriff's Office also arrived at the Arco station and Officer Watkins related to them the conversation with the women. The women were then transported to the Sheriff's substation.

At approximately 6:00 P.M., the Yuma County Sheriff's Office received a call that a Mexican looking male wearing dark blue

clothing was trying to break into a trailer at that same truck stop. Pearson and Harold arrived at the truck stop and saw defendant standing there. He fit the description given them and they called him over to the car. As he was walking toward them, Sergeant Gosch of the Yuma County Sheriff's Office arrived. He informed the officers that the Phoenix Police Department was investigating a homicide at the home of the owner of the vehicle that Officer Watkins had stopped earlier.

When defendant arrived at the car, Sergeant Harold asked him for identification; he produced a Hawaii driver's license. Officer Pearson then got out of the car and talked to the woman who had telephoned the police about the burglary. She identified defendant as the man she had seen breaking into the trailer. Pearson also inspected the trailer and saw a broken window in the door of the trailer and shoe prints around the door area.

While Officer Pearson was making his inspection, Sergeant Harold talked with defendant. Because Sergeant Harold died prior to the suppression hearing, no testimony was offered as to their conversation. Sergeant Gosch testified, however, that defendant removed some items from his pockets, including the car keys to Rabb's Oldsmobile. Defendant was subsequently placed under arrest.

■ Defendant contends that "the fact that the [defendant] may have appeared to be a Mexican and was wearing dark clothing in front of a cafe in Salome * * * does not constitute probable cause to arrest him." Citing *Florida v. Royer*, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983), defendant additionally argues that he was arrested when Sergeant Harold asked him to empty his pockets. He, therefore, maintains that the car keys should have been suppressed as the fruits of an illegal search. The fourth amendment, U.S.Const. amend. IV, requires a showing of probable cause before a defendant may be arrested. We have defined probable cause as reasonable grounds to believe that an offense is being or has been committed by the person

arrested. *State v. Wiley*, 144 Ariz. 525, 698 P.2d 1244 at 1250 (1985). Additionally, a defendant is arrested when his liberty of movement is interrupted and restricted by the police. *State v. Green*, 111 Ariz. 444, 446, 532 P.2d 506, 508 (1975). Whether such restriction has occurred is determined by an objective evaluation of the evidence and not by the subjective belief of the parties. *Id.*

■ Because Sergeant Harold was unavailable to testify, we are unable to determine whether defendant was free to leave when he emptied his pockets. The state, however, has the burden of showing that the arrest was proper. *See State v. Edwards*, 111 Ariz. 357, 360, 529 P.2d 1174, 1177 (1975). In the absence of proof to the contrary, we must assume that defendant was arrested at the time he relinquished the keys.

■ We do not find this assumption defeating, because we believe that the police had probable cause to arrest defendant at that time. They had previously received a report of an attempted burglary and were given a description of the suspect. Defendant both matched this description and was in the area of the crime scene. It is noted that the Salome-Vicksburg-Wenden area is an area of sparse population, Salome the largest of the three communities having an estimated population of 606. Local people are readily recognized and strangers stand out. It is highly unlikely that there was another similarly dressed person fitting defendant's description in the vicinity. We believe there was probable cause to arrest defendant. We find no error.

## SIXTH AMENDMENT RIGHT TO A SPEEDY TRIAL

Defendant next argues that he was denied his right to a speedy trial under the sixth amendment to the United States Constitution. In order to understand this argument, a brief chronology is necessary. Defendant was arrested on 2 April 1981, and indicted six days later. He was subsequently tried, and the jury returned a ver-

**44**

dict of guilty to first degree murder on 1 September 1981. The trial judge was thereafter forced to disqualify himself from the sentencing because he had discussed defendant's potential sentence with a member of the victim's family. A new trial was ordered on 19 November 1981, pursuant to *State v. McDaniel,* 127 Ariz. 13, 617 P.2d 1129 (1980). The state filed a special action on 23 November 1981, appealing the order for a new trial and we declined jurisdiction. The state then sought relief in the court of appeals on 9 December 1981. On 11 June 1982, defendant filed a motion to dismiss the appeal alleging the state's failure to prosecute diligently. This motion was denied on 1 July 1982, by the court of appeals. On 15 February 1983, the state's appeal was transferred to this Court and we ordered a new trial. *State v. Leslie,* 136 Ariz. 463, 666 P.2d 1072 (1983). After a hearing to determine whether the state had violated Rule 8, Arizona Rules of Criminal Procedure, 17 A.R.S., defendant was retried on 31 January 1984. Defendant now argues that the time between the grant of a new trial by the trial court on 19 November 1981, and the Supreme Court order for new trial issued on 5 July 1983, constitutes "inexcusable delay" and that, pursuant to the sixth amendment, the charges against him should be dismissed with prejudice. We do not agree.[1]

▮▮▮▮ The sixth amendment guarantees a defendant "the right to a speedy and public trial." U.S.Const. amend. VI. This right is triggered by either formal indictment, information or actual restraint of arrest. *State v. Soto,* 117 Ariz. 345, 348, 572 P.2d 1183, 1186 (1978). The United States Supreme Court has enunciated a balancing test to be used in determining whether a defendant has been denied this constitutional protection. Four factors must be considered: (1) the length of the delay; (2) the reasons for the delay; (3) the defendant's assertion of the right, and (4) the prejudice caused to the defendant. *Barker v. Wingo,* 407 U.S. 514, 530, 92 S.Ct. 2182, 2192, 33 L.Ed.2d 101 (1972). Of these four factors, the length of the delay is the least conclusive and the prejudice suffered by the defendant is the most important. *Soto, supra.* In fact, the length of the delay is essentially a triggering mechanism necessitating analysis of the other factors.. *State v. Wright,* 113 Ariz. 313, 315, 553 P.2d 667, 669 (1976).

▮▮▮▮ In the instant case, length of the delay, approximately twenty months, is not so long as to be prejudicial *per se. Cf. Barker v. Wingo, supra* (no per se violation when length of delay was approximately five years); *United States v. Deleon,* 710 F.2d 1218 (7th Cir.1983) (no speedy trial violation where 44–½ month delay from time of arrest to commencement of trial). It is, however, sufficiently long to cause us to examine other factors.

We look first to the reasons for the delay. The state had filed a special action in this court and then sought relief in the court of appeals contesting the order requiring a new trial. Defendant argues that this was unnecessary and that after we denied jurisdiction the state should have proceeded directly to trial rather than pursuing the matter in the court of appeals. Defendant contends, therefore, that "the delay was totally unjustified."

▮▮▮▮ We have held that the prosecution's exercise of its right to appeal from an adverse ruling is considered a justifiable excuse for delay. *See State v. Million,* 120 Ariz. 10, 14, 583 P.2d 897, 901 (1978). Thus, the state was within its rights in filing a special action. Furthermore, we do

---

1. Defendant raises only the question of the violation of the sixth amendment to the United States Constitution in this appeal. He does not raise the question of violation of our speedy trial rules. Rule 8, Ariz.R.Crim.P., 17 A.R.S. That issue was raised in a special action proceeding (No. 17105–SA). We granted the petition and we remanded the matter to the trial court "for a proceeding pursuant to Rule 32, Arizona Rules of Criminal Procedure, 17 A.R.S. to determine what, if any, prejudice the petitioner, Paul Clyde Leslie, [had] suffered by reason of the delay in bringing [the] matter to trial." The trial court by order dated 5 December 1983 found no prejudice.

not believe that pursuing an appeal in the court of appeals after we denied jurisdiction was improper. First, a denial of jurisdiction in a special action does not necessarily constitute a ruling on the underlying merits. Rather, it may indicate that the appealing party has an adequate remedy through the ordinary appellate channels. Thus, our initial denial should not be interpreted as indicating that the state's appeal was frivolous. Second, the prosecution had a strong interest in the appeal. This was a violent crime, which the state had already spent time and effort prosecuting. The state hoped to avoid expending additional time and money in presenting evidence to a second jury. Accordingly, we do not agree with defendant that the delay occasioned by the appeal was unjustifiable. Of course, if it could be shown that the appeal by the state was for the purpose of delay or harassment, we would view the matter differently.

As to the third factor, we find that defendant objected to the delays in a manner sufficient to demonstrate his interest in a prompt adjudication of his guilt. *See Barker v. Wingo, supra.*

■■■■■■ We look then to the last and most important factor—prejudice to the defendant arising from the delays. Defendant alleges that he was prejudiced in two ways. First, he was incarcerated during this time and the strain of his confinement had a negative impact on his physical appearance, and with it his credibility. Because his credibility was crucial to his defense, he maintains that he was harmed by this imprisonment. The harms alleged by defendant go essentially to his ability to conduct his defense and are speculative in nature. We are unconvinced that, in general, a period of incarceration tends to impact upon one's credibility and find no evidence that it did so in this case.

■■■■ Second, defendant contends that the delay caused him to lose a key defense witness. Throughout the trial, defendant admitted that he had burglarized the victim's house but denied killing her. He alleged that another person entered the

house later and committed the murder. At the first trial, he had called one of the victim's neighbors, Linda Baverman. She testified that her life had been threatened because of her involvement in a "land deal." She also stated that on the morning of the attack she saw two strange men pacing back and forth between her house and the victim's house and that they frightened her. Defendant had argued that these men had intended to kill Mrs. Baverman but had mistakenly attacked the victim. At some point between the first and second trial, the witness left Phoenix and defendant was unable to find her. At the second trial, defendant was forced to read Mrs. Baverman's testimony from the first trial to the jury, rather than having the benefit of live testimony. He contends that this prejudiced his case.

■■■■ We do not find that defendant was harmed. Even though we believe that "live" testimony is better than "read" testimony, we find that the prejudice in the instant case was too speculative to support an allegation of a sixth amendment violation. A defendant is entitled to a fair trial, not a perfect one. *Bruton v. United States*, 391 U.S. 123, 135, 88 S.Ct. 1620, 1627, 20 L.Ed.2d 476 (1968). We find no error.

## JURY INSTRUCTIONS

Defendant raises several arguments concerning jury instructions. He argues that the trial court should have given a *Willits* instruction, an instruction on burglary as a lesser-included offense and an instruction concerning the use of previous testimony.

### 1. *Loss of Evidence.*

At trial, Police Officer Billy Butler testified that he had examined Mrs. Rabb's car after it had been impounded and that he had noticed several spots on the emblem and the light in the front of the car. Because he believed that these spots were too small, he did not notify the crime lab or ask any technicians to analyze the spots. He

did, however, testify as follows on direct examination:

Q. * * * have you had occasion to see blood before?

A. Yes.

Q. Very frequently?

A. Yes.

Q. Do you feel that you can recognize blood if you see it?

A. Yes.

 * * * * * *

Q. Now, these photographs marked 13 and 14, are they photographs of the car that you examined?

A. May I see the license plate? Yes, that's the same car.

Q. Now, did you examine that closely on the outside for blood?

A. Yes, we did.

Q. What did you find?

A. I found on the emblem, which is in the middle of the grille, what appeared to be minute spots of what I considered to be blood, also just above the emblem and also by one of the lights, what appeared to be a minute spot of blood.

 * * * * * *

Q. Do you have any opinion, based upon your experience, as to whether that was blood or not?

A. Due to my experience as a police officer and the numerous times—

 * * * * * *

OBJECTION BY DEFENSE COUNSEL

THE COURT: Overruled, proceed.

Q. (BY MR. LYNCH): What's your opinion?

A. In my opinion that was blood, yes.

 * * * * * *

Q. Did you try to scrape that blood off and have it submitted to the crime lab for analysis?

A. No sir, I did not.

Q. Why not?

A. It was too minute of an amount for the crime lab.

The state also called as a witness Everett Allen Raphael, a criminalist for the city of Phoenix. He stated, on cross-examination, that there was a sufficient amount of substance on the car to allow him to determine whether it was blood, although he would be unable to determine the type grouping or anything further. In closing argument, the prosecution also stated:

What about the blood on the car? Okay. Detective Butler should have had the car checked out by the crime lab. There is no question about that, and we can all see that, I can see it. * * * The fact of the matter is, it looked like blood.

Detective Butler has seen blood before, you have all seen blood, there is a pretty strong inference that it was blood, blood that was put on the car after Mary Rabb was killed.

The fact that these spots may have been blood was a vital part of the state's case. Defendant admitted that he had burglarized the victim's residence but claimed he never saw her. The body was found in the garage near where the automobile was parked. There were no fingerprints on the murder weapon; neither was there blood on defendant nor on the inside of the car. In addition to its allegation of blood on the car, the state relied on the fact that defendant had admitted his presence in the house, that he was in possession of a ring that the victim usually wore, that he was wearing some of the victim's clothes, that a water hose in the backyard was uncoiled and that there was a damp towel found in the victim's house. The blood would indicate that the car was in the garage at the time of the murder and contradict defendant's testimony that he had not seen the victim at the time he burglarized the house and stole the car.

Based on this testimony, defendant requested a *Willits* instruction. *See State v. Willits*, 96 Ariz. 184, 393 P.2d 274 (1964). The trial court denied this request. Defendant contends this was reversible error.

The question of lost or destroyed evidence has generated a great deal of case law. When items are lost or destroyed a

defendant is unable to determine whether they would have been helpful in his defense. Our court has used, as one method of overcoming this problem and ensuring a fair trial, the *Willits* instruction. That instruction states:

If you find that the state has destroyed, caused to be destroyed, or allowed to be destroyed any evidence whose contents or quality are in issue, you may infer that the true fact is against the interest of the state.

*State v. Willits, supra.*

 In the instant case, we are concerned with evidence that was allowed to be destroyed or lost. The state has a duty to act in a timely manner to preserve evidence that is obviously material and reasonably within its grasp. *State v. Perez,* 141 Ariz. 459, 463, 687 P.2d 1214, 1218 (1984). A defendant is entitled to a *Willits* instruction upon proof that (1) the state failed to preserve material evidence that was accessible and might have tended to exonerate him and (2) there resulting prejudice. *State v. Reffitt,* 145 Ariz. 452, 461, 702 P.2d 681, 690 (1985). Further, a trial court's determination on whether or not to give a *Willits* instruction is not reversible error absent an abuse of discretion. *Id.*

 The state's questions during trial and comments during closing argument testify strongly to the materiality of the lost evidence. Additionally, the state's own expert testified that he could have determined whether the substance had indeed been blood. Therefore, the first requirement of the test is met.

 The issue of prejudice is crucial in the present case. Where the state places reliance on the evidence as blood, its duty of preservation becomes increasingly important. It is fundamentally unfair to allow the state to introduce conclusions as to the contents of certain evidence against a defendant without allowing him to inspect it in a manner that allows for meaningful rebuttal. *Scales v. City Court of City of Mesa,* 122 Ariz. 231, 234, 594 P.2d 97, 100 (1979). We might be able to over-

look the failure to preserve the evidence had the state not emphasized the fact it was blood. The state, in effect, created prejudice by using the blood to contradict the defendant's claim that he had never seen the victim. Thus we find prejudice in the state's failure to remove the spots and have them preserved, coupled with the state's affirmative comments concerning the fact that the spots were blood. We hold that the trial court's failure to give the requested *Willits* instruction was an abuse of discretion amounting to reversible error.

### 2. *Linda Baverman's testimony.*

Defendant submitted two alternative instructions concerning Linda Baverman's testimony:

(1) A good faith effort has been made by the defendant to locate Linda Baverman; thus, no unfavorable inference can be drawn against the defendant from her failure to appear and testify.

(2) A good faith effort has been made to locate Linda Baverman; thus, no unfavorable inference can be drawn from her failure to appear and testify.

The trial judge refused to give these charges. Defendant now maintains that the failure to give these requested instructions constituted reversible error. He gives two reasons for this assertion. First, he argues that "[b]y refusing to instruct the jury regarding how it was to evaluate the Baverman testimony, the court left open the possibility that the jury could disregard it merely because said witness was not present at trial." Second, defendant contends that the trial court's refusal to explain that no unfavorable inference could be drawn from defendant's use of previous testimony constituted fundamental error because the trial court failed to instruct "on all matters vital to the consideration of the evidence."

 First, we find the claim that the jury might have disregarded Mrs. Baverman's testimony because she was not present to be without merit. The trial judge told the jury that it must decide the accuracy of *each* witness' testimony and

the jury was aware that Mrs. Baverman was considered to be a witness. Additionally, both the prosecution and defense counsel spent several minutes addressing her testimony in their closing arguments, thus ensuring that the jury would realize the importance of her testimony and evaluate it during deliberations. Admittedly, as we have noted above, reading testimony is not the same as live testimony but we do not believe this demands a specific instruction in every case. The necessity for an instruction regarding the absence of a witness will be left to the sound discretion of the trial court.

 We also reject defendant's second argument that failure to give the requested instruction constituted fundamental error. Defendant contended that the jury might falsely infer that defendant was trying to hide something by not producing a live witness and felt that the jury charge was essential to eliminate this possibility. We do not find that failure to give this requested instruction was erroneous. "A judge need not give instructions on every subsidiary fact and possible inference. * * As long as a judge gives adequate and clear instructions on the applicable law * * [the] extent of the charge [is a matter] within his discretion." *Commonwealth v. Phong Thu Ly*, 19 Mass.App. 901, 471 N.E.2d 383, 384 (1984). Jury instructions become too cumbersome if the trial judge is forced to instruct on minute, nonessential matters. The trial court must be able to limit what he will say to the jury in order that the instructions do not become so long and complex as to be confusing and useless. Even though, in the instant case, the offered instruction may have been a comment on the evidence where the defendant faces a murder conviction and presents only one witness, the trial judge sacrifices little efficiency by giving a clarifying instruction which explains to the jurors the status of the testimony that is read to them. The failure to read the defendant's instruction, less the comment on the evidence, though perhaps regrettable in retrospect, falls short of fundamental error. Our reading of the record reveals no prejudice or abuse of discretion due to the omitted instruction. We find no error.

### 3. Instruction on the lesser-included offense.

Defendant requested the following jury instruction:

[T]he crime of murder first degree committed in the course and in furtherance of the crime of burglary second degree includes the less serious charge of burglary second degree. The State may prove burglary second degree but fail to prove the more serious crime of murder first degree committed in the course of and in furtherance of the crime of burglary second degree.

You are permitted to find the defendant guilty of the less serious crime of burglary second degree one, if the evidence does now show beyond a reasonable doubt that the defendant is guilty of murder first degree in the course of and in furtherance of the burglary second degree;

And if the evidence does show beyond a reasonable doubt the defendant is guilty of burglary second degree.

The trial court denied this request. Defendant now contends that because burglary is a lesser-included offense of felony murder and because there was sufficient evidence to warrant an instruction, the judge's denial constituted prejudicial error.

 We disagree for two reasons. The instruction is incorrect in that it implies that to be guilty of felony murder defendant must be guilty of first degree murder in addition to burglary. This does not correctly state the law. A person may be guilty of felony murder even though the killing standing alone would be second degree murder. It is the fact that the homicide was committed during a felony (burglary) that can raise what otherwise would be a second degree murder to murder in the first degree. It is the felony that provides the malice which makes it first degree murder. *State v. Ferrari*, 112 Ariz. 324, 541 P.2d 921 (1975). The instruction

being incorrect, the judge did not err in refusing to give it. *State v. Axley*, 132 Ariz. 383, 393, 646 P.2d 268, 278 (1982).

▇▇▇ Neither do we believe, as defendant contends, that burglary is a lesser-included offense of felony murder. *Garrett v. United States*, 471 U.S. ——, 105 S.Ct. 2407, 85 L.Ed.2d 764 (1985).

## DEATH PENALTY

▇▇▇ The special verdict of the trial court at sentencing stated "There are no mitigating circumstances." Defendant argues that the trial court improperly concluded that there were no mitigating factors. He urges us to remand the case for resentencing and issue guidelines requiring trial judges to give detailed statements of whether and why they have found the existence or nonexistence of mitigating factors. We agree with defendant that the trial court erred and take this opportunity to clarify the procedural requirements of A.R.S. § 13–703(D).

In conducting a hearing in aggravation and mitigation, pursuant to A.R.S. § 13–703, the trial court acts first as the fact finder. It must consider whether the state has proven any of the aggravating factors enumerated in § 703(F) beyond a reasonable doubt. *State v. Carriger*, 143 Ariz. 142, 692 P.2d 991 (1984). It must also determine whether the defendant has shown mitigating circumstances by a preponderance of the evidence. *State v. McMurtrey*, 143 Ariz. 71, 73, 691 P.2d 1099, 1101 (1984). Mitigating circumstances are defined as "any factors * * * relevant in determining whether to impose a sentence less than death * * *." A.R.S. § 13–703(G). After the trial court has made these findings of fact, it then engages in a balancing test in which it determines whether the mitigating factors are suffi-

ciently substantial to call for leniency. § 703(C).

In the case at bar, defendant introduced evidence that he was a model prisoner. He also argued that there was evidence that another person had been present who did the actual killing. *See Enmund v. Florida*, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982). On appeal, defendant pointed to several other factors, of which the trial court was aware: defendant's lack of a criminal record for violence; defendant's service in the United States Marine Corps and the fact that defendant was 24 at the time of the crime. The presentence report also contained relevant information. Although the investigating officer noted that defendant had been in and out of jail and had failed to keep in contact with his probation officer or take advantage of the rehabilitative process, he described defendant as "an intelligent and personable individual who would probably not plan the murder of an individual * * * for personal gain." Additionally, the officer indicated his agreement with defendant's attorney that the murder was a spontaneous killing.[2] With the exception of defendant's claim that another committed the murders, the state presented no evidence rebutting defendant's proof as to mitigating factors.

▇▇▇ A.R.S. § 13–703(D) requires the sentencing court to "return a special verdict setting forth its findings as to the existence or nonexistence of each of the circumstances set forth in subsection F of this section and as to the existence of any of the circumstances included in subsection G of this section." A number of trial courts have interpreted this as requiring them to state, on the record, their reasons and conclusions, as to both the existence and nonexistence of mitigating factors. *See e.g., State v. Smith*, 141 Ariz. 510, 687 P.2d 1265; *State v. Ceja*, 126 Ariz. 35, 612 P.2d 491 (1980). Although we have previ-

---

2. Defendant claimed, at oral argument, that Detective Oviedo, the chief homicide officer on the case, indicated his belief that the victim caught defendant burglarizing her residence and went after him with a hatchet. The only evidence that this was his opinion is found in a letter, attached to the presentence report, written by defendant's attorney paraphrasing the detective. When the probation officer interviewed the detective, however, Oviedo made an official recommendation that defendant receive the death penalty.

ously stated that such detailed findings are neither required nor necessary, *State v. Vickers,* 129 Ariz. 506, 516, 633 P.2d 315, 325 (1981), we believe that the better practice is for the trial court to place, on the record, a list of all factors offered by a defendant in mitigation and then explain his reasons for accepting or rejecting them. Thus, the reviewing court can be sure that all mitigating factors have been considered by the court prior to sentencing. *See Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) (United States Supreme Court held unconstitutional death penalty statutes that restricted the right of a defendant to show mitigating circumstances that might relieve him of the death penalty) and *Eddings v. Oklahoma,* 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982) (Requiring that courts must consider all relevant mitigating evidence). *Id.* at 117, 102 S.Ct. at 878, 71 L.Ed.2d at 12. Justice O'Connor, in her concurrence, explained that when it was unclear whether the trial court has considered all mitigating factors, the case must be remanded:

> In any event, we may not speculate as to whether the trial judge and the Court of Criminal Appeals actually considered all of the mitigating factors and found them insufficient to offset the aggravating circumstances * * *. *Woodson* [*v. North Carolina,* 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976) ] and *Lockett* require us to remove any legitimate basis for finding ambiguity concerning the factors actually considered by the trial court.

*Id.* at 119, 102 S.Ct. at 879, 71 L.Ed.2d at 14. In short, if we cannot determine from the record whether the trial court considered all the relevant mitigating factors, the federal constitution compels us to remand the case for further explanation. Practically, unless the trial judge tells us what factors he has considered and why he has rejected them, we cannot assure ourselves that he has acted properly.

Because we are remanding for new trial, we do not address defendant's other arguments concerning the propriety of his sentence or the constitutionality of the death penalty. Reversed and remanded for new trial.

HOLOHAN, C.J., and HAYS, J., concur.

FELDMAN, Justice, specially concurring.

I agree with the result and with all portions of the opinion except that (at 730) in which the majority concludes it is unnecessary to give instructions which would permit the jury to find defendant guilty of burglary but not guilty of felony-murder. I believe that under the facts of this case such instructions are required. *Beck v. Alabama,* 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980).

Defendant admitted that he committed burglary but claimed that Mrs. Rabb was alive when he left the house and that two unidentified persons later entered the house, assaulted and killed her. This version of the events received some support from the testimony of a neighbor who reported having seen two suspicious looking characters peering over the victim's wall. Thus, a clear question of fact was presented and, if defendant's version was believed by the jury, it should have convicted him of burglary but acquitted him of murder. By refusing to give instructions that would have permitted this result, the court presented the jury with the Hobson's choice of either freeing an admitted criminal or convicting him of felony-murder. This is the very result which *Beck* held was forbidden by the Constitution because it enhances the possibility that the jury will erroneously find the defendant guilty of the felony-murder charge. The risk of such a result "cannot be tolerated in a case in which the defendant's life is at stake." *Beck, supra,* at 637–638, 100 S.Ct. at 2389–2390.

In reaching their conclusion, the majority of this court cites *Garrett v. United States,* 471 U.S. ——, 105 S.Ct. 2407, 85 L.Ed.2d 764 (1985). That case concerned multiple punishments, a legal issue unrelated to the *Beck* principle. Further, the majority gains no support from the techni-

cal distinctions of lesser included offense made by Arizona cases such as *State v. Arias,* 131 Ariz. 441, 641 P.2d 1285 (1982).

The element the Court in *Beck* thought essential to a fair trial was not simply a lesser included offense instruction in the abstract, but the enhanced rationality and reliability [which] the existence of [such] an instruction introduced into the jury's deliberations....

The Court in *Beck* recognized that the jury's role in the criminal process is essentially unreviewable and not always rational. The absence of a lesser included offense instruction increases the risk that the jury will convict, not because it is persuaded that the defendant is guilty of capital murder, but simply to avoid setting the defendant free. In *Beck*, the Court found that risk unacceptable and inconsistent with the reliability this court has demanded in capital proceedings. [citation omitted] The goal of the *Beck* rule, in other words, is to eliminate the distortion of the fact-finding process that is created when the jury is forced into an all-or-nothing choice between capital murder and innocence.

*Spaziano v. Florida,* 468 U.S. 447, 104 S.Ct. 3154, 3160, 82 L.Ed.2d 340 (1984).

This principle controls the situation presented by the case before us and requires that the burglary instruction be given. In my view, the question is not whether the underlying felony meets the technical definition of a lesser included offense when the charge is felony-murder. Rather, the question is whether the evidence would support a verdict that the defendant is guilty of the underlying felony but not of felony-murder. In such a factual context, *Beck* teaches that the jury cannot be presented with an all-or-nothing choice but must be given the third option. The jury must be able to reach and decide those issues fairly presented by the evidence. A different rule cannot be justified.

GORDON, V.C.J., joins in this opinion.