BREARCLIFFE, Judge, concurring in part and dissenting in part:
¶23 I concur in the opinion's reasoning and holding as to the pretrial identification, but I cannot agree with its conclusion and remand on the Willits instruction. The state elected not to seek out and collect fingerprint or DNA evidence from the stolen car, but instead to base its case on the pursuing law enforcement officer's positive identification. The defendant could have, and did, try to undermine the identification and use an "incomplete investigation" as fodder in his opening statement and in cross-examination of the state's witnesses. What he was not entitled to was a Willits instruction premised on required showings he did not make. I would affirm the trial court in full.
¶24 A Willits instruction is appropriate "when the state loses or destroys evidence that would have been useful to the defense, even if that destruction is innocent." Glissendorf II , 235 Ariz. 147, ¶ 7, 329 P.3d 1049. A Willits instruction instructs the jury that it may "infer," if it finds the state's explanation inadequate, that the lost or destroyed evidence "would be against the interests of the state." See Hunter , 136 Ariz. at 50, 664 P.2d at 200 (instruction required after destruction of evidence); see also Perez , 141 Ariz. at 464, 687 P.2d at 1219 (instruction required where state fails to preserve "obviously material, and reasonably accessible" evidence and shows prejudice). It is not an impotent instruction. Indeed, it instructs a jury that it may conclude, absent a satisfactory explanation, that the state, at best, failed to collect evidence or, at worst, destroyed evidence that would have cleared an innocent man. Consequently, there are showings beyond the mere loss or destruction of evidence that must be made to be entitled to such an instruction.
¶25 Our supreme court's opinion in Glissendorf II , 235 Ariz. 147, 329 P.3d 1049, is *40 the most recent detailed discussion of the Willits issue. As the majority describes above, in Glissendorf II , the court identified a "two-element test" to determine whether a Willits instruction must be given. Id. ¶ 8. A defendant requesting a Willits instruction, however, must make four inherent predicate showings before that two-element test is satisfied: (1) that evidence existed; (2) which was destroyed (or not preserved) by the state; (3) which could have had a "tendency to exonerate" the defendant by being "potentially useful to a defense theory supported by evidence;" and (4) prejudice. Id. ¶ 8 (quoting Glissendorf I , 233 Ariz. 222, ¶ 17, 311 P.3d 244 ). Here, Hernandez did not demonstrate that evidence existed-latent fingerprints and DNA residue-or that, once possessed by the state, it had later been destroyed or lost. But most importantly, Hernandez failed both to present a defense theory supported by evidence, which the lost evidence could have advanced, and to show any prejudice from its loss.
No Showing That Evidence Existed or Was Destroyed or Lost
¶26 At trial, Hernandez expected the trial court to assume that collectible and usable fingerprint or DNA evidence was present in the subject car-a Monte Carlo-because we should expect to find fingerprints in certain places, and everyone leaves DNA behind. Although a photograph of the Monte Carlo showed what Turner described as a "fingerprint" on the driver's side window, there was no testimony as to whether the print was on the inside or outside, that the print was forensically useable, or whether it pre-dated or was contemporaneous with the events here. There was additionally no showing at all, beyond speculation, that any DNA evidence was present-forensically useable or otherwise.
¶27 Moreover, even if we presume that the fingerprint in the photograph was collectible and useable, Hernandez failed to make any showing whatever that it was impossible still to gain latent fingerprints or DNA residue evidence from the Monte Carlo. Contrary to the majority's statement in footnote four, although it is certainly true that the Monte Carlo was released to its owner before Hernandez was arrested, there was no evidence or even avowal that the defense attempted to examine or test the car. Hernandez-to support his request for the Willits instruction-could have had his counsel track down the Monte Carlo and ask the owner a few simple questions, such as "After you picked up the car, did you wash it?" "Did you wipe down the interior?" "Did you vacuum the inside?" "Has anyone other than you been in the car since you recovered it?" "May we have the car dusted for prints and scraped for DNA?" Rather than taking any of those steps, Hernandez merely relies on, and demands that the court rely on, the assumption that the purported evidence was no longer obtainable.
¶28 In Glissendorf II , as discussed more fully below, it was established that the evidence-audiotape and videotape of the victim interview-once existed but was destroyed and no longer available. 235 Ariz. 147, ¶ 2, 329 P.3d 1049. Here, reasonable people can speculate that the evidence might have existed and that it might have been unrecoverable at the time Hernandez was arrested, but we do not know. Speculation as to what may have been found in the car, however, is insufficient to support the giving of a Willits instruction. See Smith , 158 Ariz. at 227, 762 P.2d at 514 ( Willits instruction not appropriate when defendant merely speculates that lost piece of paper would have contained information implicating another).
Fingerprint and DNA Evidence Not Relevant to a Defense Theory Supported by Evidence
¶29 It is, however, a greater deficiency that Hernandez failed to articulate any connection between the evidence purportedly destroyed and a defense theory supported by any other evidence in the case. Even had Hernandez successfully shown that useful fingerprint or DNA evidence existed at one time and was no longer available-thereby checking off the first two boxes on the Glissendorf II list-he without question failed to check the third.
¶30 For the state's loss of evidence to merit a Willits instruction, the defendant must demonstrate that lost evidence would *41 have had a "tendency to exonerate" him. Glissendorf II , 235 Ariz. 147, ¶ 8, 329 P.3d 1049. In showing that evidence has a "tendency to exonerate," "the defendant must do more than simply speculate about how the evidence might have been helpful." Id. ¶ 9. That is, he must show "a real likelihood that the evidence would have had evidentiary value." Id . As our supreme court implies in Glissendorf II , evidence with the "potential to completely exonerate the defendant"-such as, perhaps, a videotape of him a town away at the time of the crime-has evidentiary value. A showing that he might have been "completely absolve[d]" is not necessary, id. ¶ 10, but a defendant must meet the required threshold of "evidentiary value" by "demonstrat[ing] that the lost evidence would have been material and potentially useful to a defense theory supported by the evidence ," id. (quoting Glissendorf I , 233 Ariz. 222, ¶ 17, 311 P.3d 244 ) (emphasis added); State v. Axley , 132 Ariz. 383, 393, 646 P.2d 268, 278 (1982) ( Willits instruction, like any other, "must be predicated on some theory of the case which may be found in the evidence, and, when not so predicated, [it] should not be given, as [its] tendency would be to mislead the jury." (quoting State v. McIntyre , 106 Ariz. 439, 445, 477 P.2d 529, 535 (1970) )).
¶31 In Glissendorf II , the Tucson Police Department possessed an audio recording of an interview of one of the two victims of child molestation. 235 Ariz. 147, ¶ 2, 329 P.3d 1049. Another state agency had videotaped the same interview and the audio recording was summarized in a written police report. Id. Six-to-twelve months after the state initially chose not to prosecute, both recordings were routinely destroyed per standard police procedure. Id . Some years later, the state elected to bring charges. Id. At trial, the victim testified inconsistently with the police report summary of her interview in some respects. Id. ¶ 19. The victim also testified that the report summary was "both inaccurate and incomplete." Id. At trial, the defendant's requested Willits instruction was denied because the recordings had not been "maliciously destroyed" nor shown to contain "exculpatory evidence." Id . ¶ 5.
¶32 In his defense, Glissendorf did not merely rely on the presumption of innocence and count on the state's failure to meet its burden of proof. As related in Glissendorf I , Glissendorf's defense theory, begun in opening statements, supported through his use of the report summary in impeaching the victim, and summed up in closing, was that the victim's statements were inconsistent. Glissendorf I , 233 Ariz. 222, ¶¶ 13, 15-16, 311 P.3d 244. In his opening statement, Glissendorf apparently alluded to an evolution in the victim's story. Id. ¶ 15 (state's characterization of opening statement). And "[d]uring cross-examination, Glissendorf attempted to highlight the discrepancies between [the victim's] testimony and her allegations from 2001, using the police report for impeachment." Id. ¶ 13. Lastly, in closing, Glissendorf asserted that the victim's "memory was unreliable, at minimum, and she possibly had fabricated the additional allegations about the bedroom incident because her first report had not resulted in prosecution." Id. ¶ 16. Glissendorf's defense, which was supported by the testimony and the fact of the earlier non-prosecution, was that the victim was mistaken or had possibly, with motive, lied.
¶33 On review, our supreme court concluded that the "several differences between [the victim's] story as recounted in the 2001 police report and her trial testimony more than a decade later, including the number of times Glissendorf had touched her," "had the potential to assist" him in impeaching the state's sole witness to the crime. Id. ¶ 19. The court observed that, by allowing the audio recordings to be destroyed, the state had caused the defendant a "two-fold harm"-depriving him of "objective impeachment evidence and undermining the exculpatory impact" of the inconsistencies between the victim's testimony and the written report summary. Id. It concluded that Glissendorf had "easily met the 'tendency to exonerate' standard" in his case, and that the trial court had erred in refusing to give the instruction. Id . ¶¶ 1, 19.
¶34 Hunter , 136 Ariz. 45, 664 P.2d 195, and State v. Leslie , 147 Ariz. 38, 708 P.2d 719 (1985), also illustrate defenses sufficient to permit a Willits instruction. In Hunter , a *42 first-degree murder case, police entered the victim's home and found signs of a struggle and the victim in a pool of blood on the kitchen floor. 136 Ariz. at 47, 664 P.2d at 197. A pair of scissors was next to the body and a bloody hunting knife was in another room. Id. The responding police officers seized the knife but not the scissors. Id. Later, as detectives were completing their investigation, a friend of the family came to the house to clean it before the victim's wife returned. Id . After receiving permission from a detective present, the friend "picked up the scissors from beside the body, wiped them off with a towel, and put them on a kitchen counter." Id . As the court recounts, "[i]t was later determined that the victim had suffered several stab wounds ... a chest wound apparently caused by a knife, and ... an abdominal wound consistent with the pair of scissors." Id. After the police determined that the scissors "may have been significant," a detective returned and retrieved the scissors. Id .
¶35 At trial, Hunter claimed he had killed the victim in self-defense. Id . He testified that he brought the scissors to the victim's home to have him sharpen them. Id. He stated that, after he handed the victim the scissors, the victim took some "playful swipes" at him and then he "shoved the victim into the doorjamb." Id. The conflict escalated, and then, he testified, the victim attacked him with the scissors, and he defended himself with a knife he grabbed from a wall display. Id.
¶36 Hunter sought a Willits instruction because the police failed to preserve the scissors to allow for collection of latent fingerprints. Id . at 50, 664 P.2d 195. The trial court refused to give the instruction. Id . On review, our supreme court concluded that Hunter was entitled to the instruction. Id . As the court stated, "if the victim's fingerprints were on the scissors they would have to have been placed there during the stabbing incident, as appellant claimed at trial." Id. at 51, 664 P.2d 195. This would have "tended to corroborate [Hunter's] claim that the victim attacked him with the scissors." Id . "This is not a case," the court concluded, "in which the destroyed evidence was of no evidentiary value whatsoever." Id.
¶37 In Leslie , the defendant was convicted of capital murder. 147 Ariz. at 41, 708 P.2d at 722. The victim was found bludgeoned to death in her garage, her body was covered by several rugs, and a small, blood-stained axe was found in the garage. Id. at 42, 708 P.2d at 723. Her car was missing. Id . Later, police in a neighboring county attempted to arrest Leslie for speeding on the freeway. Id . He pulled off the freeway, got out of the car and fled, leaving two female passengers in the car. Id . Police impounded the car and later determined it belonged to the victim. Id . Leslie was arrested several hours later. Id .
¶38 At trial, Leslie testified and admitted that he burglarized the victim's home and stole her silver, but he denied killing her and claimed that "he never saw [the victim] that day." Id. To link Leslie not just to the stolen car but also to the murder, the state highlighted "several spots" found on the exterior of the car after it was impounded. Id. at 45, 708 P.2d at 726. The police officer who noted the spots believed them to be too small to test so he never notified the crime lab about them or sought to have them analyzed. Id. at 45-46, 708 P.2d at 726-27. Despite not having tested the spots, the same officer testified that based on his "experience as a police officer" in his opinion it was blood. Id. at 46, 708 P.2d at 727. A police criminalist admitted on cross-examination, however, that there was enough of the substance on the car to determine whether it was blood, although not enough to "type group[ ]" it. Id .
¶39 Based on the testimony regarding the blood, the defendant requested a Willits instruction, which was denied. Id . Then, in closing argument, the prosecutor stated:
What about the blood on the car? Okay. Detective Butler should have had the car checked out by the crime lab. There is no question about that, and we can all see that, I can see it.... The fact of the matter is, it looked like blood.
Detective Butler has seen blood before, you have all seen blood, there is a pretty strong inference that it was blood, blood *43 that was put on the car after [the victim] was killed.
Id. at 46, 708 P.2d at 727.
¶40 On appeal, our supreme court determined that the spots potentially being blood "was a vital part of the state's case." Id . at 46, 708 P.2d at 727. It noted that there were no fingerprints on the murder weapon, and there was no blood on the defendant or on the inside of the car. Id. But blood found on the car "would indicate that the car was in the garage at the time of the murder and contradict defendant's testimony that he had not seen the victim" when "he burglarized the house and stole the car." Id . The court concluded that the trial court abused its discretion in failing to give the Willits instruction. It further stated:
We might be able to overlook the failure to preserve the evidence had the state not emphasized the fact it was blood. The state, in effect, created prejudice by using the blood to contradict the defendant's claim that he had never seen the victim. Thus we find prejudice in the state's failure to remove the spots and have them preserved, coupled with the state's affirmative comments concerning the fact that the spots were blood.
Id. at 47, 708 P.2d at 728.
¶41 Here, the majority incorrectly asserts that the third showing required by Glissendorf II -that the missing evidence be "potentially useful to a defense theory supported by evidence," 235 Ariz. 147, ¶ 10, 329 P.3d 1049 (quoting Glissendorf I , 233 Ariz. 222, ¶ 17, 311 P.3d 244 )-was met because "Hernandez's defense at trial was that he was not the driver of the car." Opinion at ¶ 15. That is just not so. Hernandez asserted no defense at all. At all times, he solely relied on the purported inability of the state to prove its case, whether because of a slip-shod investigation or weak identification evidence. Hernandez did not, for example, offer evidence of an alibi tending to show he was elsewhere at the time the officer placed him at the scene. Nor did Hernandez-as was his right-offer any evidence of his own that he was not the driver. Hernandez merely put the state to its burden of proof.
¶42 In his opening statement, this course was laid out:
So you will learn what the State has in this case, and what they have is a very quick few seconds of observation of who the driver was. They have another observation as to the profile as the driver was running away. They have a bad description of whoever that driver was and they also have a photo suggestion to try to make a[n] identification. But what don't they have? Fingerprints, photos, a video, the registration of the vehicle. Nothing in the vehicle that linked that driver to Mr. Hernandez.
He continued:
[We] don't have the burden of proof as the Judge has told you.
The burden lays only on this table and [the prosecution] ha[s] the burden to prove to you beyond a reasonable doubt as the Judge just said. That means that you must be left firmly convinced that it was Pablo Hernandez driving that day.
And, in summary:
[A]t the end of this trial my co-counsel ... will come before you and he will ask a question of you. If you are still wondering if it actually was Mr. Hernandez in that vehicle, let alone the driver, if that's still something you are thinking about, then you have to come with the only appropriate verdict of not guilty.
¶43 Hernandez did not assert that any evidence showed he was not in the car, or that he was in fact not present at the time, or that someone else confessed to the crime; each of which, if such evidence existed, could have been a defense theory supported by evidence. Instead, Hernandez simply based his case on the state's burden of proof. Such is a wholly legitimate, fair, and common-place way to defend a case. See State v. Hall , 136 Ariz. 219, 221, 665 P.2d 101, 103 (App. 1983) ("It is axiomatic that the burden is always on the state to prove all of the elements of the crime and the identity of the person who committed the crime beyond a reasonable doubt."); Ariz. R. Crim. P. 19.1(b)(4), (b)(5) ("the State must offer evidence in support of the charge;" "the defendant may ... offer evidence in his or her defense"). See also, *44 e.g. , State v. Rodriguez , 126 Ariz. 28, 35, 612 P.2d 484, 491 (1980) ("The only question we have here is whether the defendant's attorney, over the objection of defendant, as a trial strategy, could decide not to call any witnesses after the State had rested. We think he could."). But doing so is not the same as having a defense theory supported by evidence. It is rather only and wholly a calculated risk that the state's theory will be insufficiently supported by evidence.
¶44 Had Hernandez, like Glissendorf, Hunter, and Leslie, either testified, presented some other testimony, or pointed to evidence supporting a defense theory to which fingerprint or DNA evidence would have been potentially useful, he might have met the third Glissendorf II requirement.[8] Contrarily, had Hunter not asserted a self-defense theory supported by his testimony, had Leslie not testified that he was present but never saw the body of the victim, or had Glissendorf not been able to show concrete inconsistencies in the victim's testimony, it is unlikely that our supreme court would have found error in those cases.[9]
¶45 The requirement that there be "a defense theory supported by the evidence" to which the lost evidence is "potentially useful," id. , either means something or it does not. Hunter , Leslie , and Glissendorf II certainly suggest that it does. In each case, there was independent evidence-whether the defendant's trial testimony or contradictions between pretrial statements and another witness's trial testimony.[10] And, in each case, that evidence supported an asserted defense-self-defense, actual innocence, or fabricated witness testimony. If this predicate showing for a Willits instruction simply means that the defendant must put the state to its burden of proof, the requirement adds nothing to the inquiry; the state always bears the burden of proof. Perhaps in this case on review, or in another appropriate case, our supreme court will illustrate more concretely what it means by the need to have a "defense theory supported by evidence," Glissendorf II , 235 Ariz. 147, ¶ 10, 329 P.3d 1049 (quoting Glissendorf I , 233 Ariz. 222, ¶ 17, 311 P.3d 244 ), before the failure to give a Willits instruction becomes reversible error.
No Showing of Prejudice by the Loss of the Evidence
¶46 Finally, Hernandez failed to make any showing that he was prejudiced by the purported loss of evidence. Our supreme court in Glissendorf II repeated the requirement from a line of cases that a defendant seeking a Willits instruction show prejudice from the loss of evidence before he can obtain the instruction-not merely that he show prejudice on appeal because he was denied the instruction itself. 235 Ariz. 147, ¶ 8, 329 P.3d 1049. As the court stated thirty years earlier in Perez :
We hold today that where the state fails to act in a timely manner to ensure the preservation of evidence that is obviously material, and reasonably accessible, a defendant is entitled to a Willits instruction upon a showing that he or she was prejudiced thereby. In other words, where the state failed to procure obviously material evidence, *45 the defendant must show actual prejudice before he or she can claim entitlement to a Willits instruction.
141 Ariz. at 464, 687 P.2d at 1219. That is, even if a defendant asserts a defense theory supported by evidence, he must show he was denied evidence that would have advanced that theory in a concrete way.
¶47 In Perez , the defendant was accused of robbing a convenience store. Id . at 463, 687 P.2d at 1218. He asserted a "mistaken identity" defense. Id . at 464, 687 P.2d at 1219. Detectives investigating the robbery viewed a store surveillance tape of the robbery, but did not take possession of the tape and it was ultimately erased by the store owner. Id . at 461, 463, 687 P.2d at 1216, 1218. Perez argued that the state's failure to preserve the videotape required a Willits instruction, and that, had the instruction been given, he "could have been acquitted." Id . at 463, 687 P.2d at 1218. The trial court denied the requested instruction and he was ultimately convicted of the robbery. Id. at 461, 687 P.2d at 1216. On appeal, our supreme court concluded that the tape was "obviously material" and the state-although it never possessed the tape-"could have, and ... should have" secured its possession. Id. at 463, 687 P.2d at 1218.
¶48 While recognizing the state "does not have an affirmative duty to seek out and gain possession of potentially exculpatory evidence," our supreme court stated that the prosecution does have a duty "to act in a timely manner to ensure the preservation of evidence it is aware of where that evidence is obviously material and reasonably within its grasp." Id. at 463, 687 P.2d at 1218. However, our supreme court found, despite the foregoing, that the trial court did not abuse its discretion in refusing to give a Willits instruction because Perez had not shown prejudice. Id. at 464, 687 P.2d at 1219. Our supreme court stated:
Though the videotape, in the instant case, was obviously material, easily accessible, and available for seizure for at least a "couple of days" before it was erased, the appellant has failed to make the requisite showing of prejudice. He has presented no evidence to support his assertion that had the videotape been presented to the jury, he would have been acquitted of the February 13th robbery because the tape would have proven his mistaken identity defense. In fact, the only evidence of the tape's probative value indicates that it would have inculpated rather than exonerated appellant .
Id. (emphasis added). Beyond the fact that Perez might have certainly benefitted from the Willits instruction at trial, because, as the court recognized, the tape would have likely confirmed the eyewitness accounts of the defendant's presence in the store, Perez "benefitted from its destruction" and was not prejudiced. Id . (emphasis omitted).
¶49 Here, the trial court found that, even had fingerprint and DNA evidence been found and collected, the results would have been "neutral" in terms of its capacity to exculpate or inculpate Hernandez. That is, had the Monte Carlo been tested for latent fingerprints and DNA, the presence of Hernandez's fingerprints and DNA would have inculpated him. However, the absence of useable fingerprints or conclusive DNA samples-or even the presence of fingerprint or DNA evidence showing that someone else at some point had been in the car-could not have exonerated him wholly or partially. Consequently, neither fingerprint nor DNA evidence would have been of any evidentiary value to Hernandez even had he presented an actual defense theory, and thus he cannot show the prejudice required for a Willits instruction.
¶50 Requiring that lost evidence be "potentially useful" in advancing a defense theory otherwise supported by actual evidence, such that a defendant is prejudiced by its loss, places reasonable limits on what can be a powerful instruction. Without such a reasonable limits, in every case with a claim that the state failed to prove presence at the scene of a crime beyond a reasonable doubt, the defendant will demand a Willits instruction because fingerprints or DNA -or even some witness who may or may not have seen him across town at the time-was not sought out. A defendant will be able to claim, for example, that, despite surveillance camera footage of someone who looks just like him in *46 the convenience store holding a gun on the cashier, he is entitled to a Willits instruction because investigators failed to swab the counter for DNA and dust the door for prints. He will argue, because we would expect to find his prints and DNA at the store if he was the robber, the absence of his prints and DNA "tends to exonerate him"-a claim tethered to no defense other than the presumption of innocence and the state's burden of proof. A trial court, citing this opinion, would be required to give the Willits instruction. But a Willits instruction should not be the rule. A court should require that a defendant seeking the instruction show some reason, grounded in other evidence, as to why the uncollected evidence matters. By not requiring a link between the missing evidence and a defense theory otherwise supported by evidence in the record, this opinion is making new law.
¶51 Because Hernandez did not meet any of the requirements stated in Glissendorf II for a Willits instruction, let alone all of them, I cannot conclude that the trial court abused its discretion in denying the instruction. I respectfully dissent in part.[11]

This is not to say that, to receive a Willits instruction, Hernandez must exercise his constitutional right to testify in derogation of his constitutional right to refuse to do so. However, his testifying would merely be one of many possible ways, and likely the most direct way, by which to support a defense theory with evidence.

One case suggests that, even where the defendant does not assert a defense theory supported by other evidence, a Willits instruction may be required where the state makes the untested evidence a centerpiece of its case. State v. Lang , 176 Ariz. 475, 485, 862 P.2d 235, 245 (App. 1993) (state focused closing argument on envelope tested for fingerprints but not DNA). Here, the state did not mention fingerprints or DNA except to address Hernandez's cross-examination and closing argument, and to say, in closing, "Now, there was a lot of testimony about DNA or fingerprint evidence, but there is no DNA or fingerprint evidence in this case." The state emphasized, "What we have is the out-of-court pretrial identification that Turner made within four or five minutes of first seeing Pablo Hernandez. We have the in-court identification of Pablo Hernandez."

In the Willits case itself, the police allowed seized explosives to be destroyed by the military, which prevented Willits from proving his defense that the explosion was accidental. This defense was supported by expert testimony and Willits's own testimony at trial. 96 Ariz. 184, 187-88, 393 P.2d 274.

Although the majority did not address the remaining issue on appeal-whether the defendant's cold expert was properly precluded-I would affirm the trial court on this basis as well. Given that Detective Deloria's proposed testimony was to describe police conduct-the preferred use of six-pack photographic line-ups-under different circumstances, it was not relevant to the facts of this case. Consequently, Deloria's proffered testimony did not satisfy Rule 702(a)-(c), Ariz. R. Evid., and the court did not abuse its discretion in precluding it.