759 P.2d 579

**STATE of Arizona, Appellee,**

v.

**Eugene Walter TUCKER, Appellant.**

No. 6711.

Supreme Court of Arizona.

June 2, 1988.

Robert K. Corbin, Atty. Gen., William J. Schafer III, Chief Counsel, Crim. Div., Joseph T. Maziarz, Asst. Atty. Gen., Phoenix, for appellee.

Frederic J. Dardis, Pima County Public Defender, Frank P. Leto, Pima County Deputy Public Defender, Tucson, for appellant.

GORDON, Chief Justice

Appellant Eugene Walter Tucker was convicted of one count of first degree murder in violation of A.R.S. § 13–1105 and sentenced to life imprisonment without the possibility of parole for 25 years. We have jurisdiction pursuant to Ariz. Const. art. 6, § 5(3) and A.R.S. §§ 13–4031, –4035.

Appellant raises the following issues for review:

1. Did the trial court abuse its discretion in denying Tucker's motions to continue and to preclude one of the State's witnesses from testifying where the State failed to timely disclose its witnesses?

2. Was appellant denied a fair trial where the State destroyed partial, latent fingerprints and the trial court gave the jury a *Willits* instruction?

3. Were appellant's statements to the police involuntary?

4. Was appellant denied a fair trial because the trial court refused to instruct the jury on motive and manslaughter?

5. Was appellant denied a fair trial because of the prosecutor's questions concerning appellant's parole status?

I. FACTS

On August 8, 1984, Tucker and Thomas Roper drove to a bar to have lunch. Roper was the owner of the apartment complex

where Tucker and his girlfriend, Janet Professori (Janet),[1] lived. Shortly after they arrived, the victim, Robert Broussard, asked Tucker and Roper if they were interested in playing pool. They agreed, and the three of them played pool for approximately an hour. During this time, Tucker and Roper each drank about four beers.

The trio decided to go to the Dream Street, a nightclub about a 20–minute drive away. They rode together in Roper's truck and arrived at about 5:00 p.m. The three took a table, ordered more beer, and talked. At one point, Tucker and Broussard argued, and Broussard left the table. Later, Broussard rejoined Tucker and Roper at the table.

About a half hour later, Tucker walked to the telephone to call Janet to ask for a ride home. While Tucker was making the call, Roper went to the men's room because he was feeling ill. When Roper returned, both Tucker and Broussard were gone. The table had been cleared, and Roper's key ring which he had left on the table, was gone. Roper walked outside and saw Broussard's body lying on the ground covered with a blanket.

That day, Janet had arrived home at approximately 4:30 p.m. and noted that her .38–caliber revolver was missing. Fearing that Tucker had taken the gun, she tried to locate him through his friends, George and Rosemary Stair, and the apartment manager. At about 5:30 p.m., Janet received Tucker's call, asking her to come and get him before he did "something crazy." She immediately drove to the Dream Street bar and arrived at about 6:00 p.m.

Janet gave the police a taped, eyewitness account of the murder after Tucker's arrest later in the evening. According to this statement, as Janet got out of her truck, she saw Tucker exit the bar. Another man, Broussard, followed Tucker out the door. Broussard approached Janet and asked if she "got high." Janet said she didn't, and Broussard apologized to her. Janet said to Tucker, "Let's go home," and turned, heading for her truck. Broussard walked away, and Tucker followed after

him. As Janet got back into her truck, she saw Tucker point a gun at Broussard, heard the weapon discharge, and saw Broussard fall to the ground.

After the shooting, Tucker got into Janet's truck, saying, "Let's get out of here." As she was driving, Janet saw her gun on the floor of her truck. When they arrived at their apartment, Tucker directed Janet to pack a suitcase for him because he "need[ed] to get out of here." Janet did as requested, and then helped Tucker jumpstart his truck and followed him to the home of George and Rosemary Stair. En route to the Stairs' home, Janet wrapped the gun that was still on the floor of her truck in a white T-shirt. At trial, when Janet (by then Mrs. Tucker) recanted this account of the murder, her taped statement was played for the jury.

A passerby, Milton Cole, also witnessed the shooting. Cole was walking toward the bar when he noticed two men walking out. According to Cole, one of the men appeared to grab something out of a truck and shoot the other man in the head. Cole then saw the first man and a woman jump into the truck and drive away.

At the Stairs' house, Tucker told the Stairs' daughter, Donna Burwell, "I just blew a guy away." George Stair was not at home, but Tucker spoke with him on the telephone. Burwell overheard Tucker say, "You know, Dad, nobody messes with my turf." Burwell saw Tucker consume four or five beers at the Stair residence.

In the meantime, Janet had returned to the apartment and called the police. She gave the gun to the police and made her taped statement. Tucker was apprehended at the Stair residence without incident. After being arrested, Tucker made inculpatory statements concerning the murder weapon and how the victim was killed. The police took Tucker to his apartment, questioned him, and then transported him to the Tucson police station for an intoxilyzer test. Finally, the police transported Tucker to the Pima County Jail. En route, Tucker gave his version of the shooting

1. Prior to trial, Tucker and Professori were married.

incident, which was different from the story he related at trial.

## II. NONDISCLOSURE OF WITNESSES

Tucker claims that he was denied a fair trial and the right to prepare his defense. He bases this claim in part on the trial court's denial of his motion for a continuance, which he requested because the State failed to timely disclose its witness list. He also maintains that the judge erred in allowing the State to present the testimony of an undisclosed witness.

### A. Instances of Nondisclosure

Tucker was arraigned on one count of first degree murder on August 27, 1984. In October 1984, Tucker filed his Rule 15 notice of disclosure,[2] listing potential defenses to the murder charge. The public defender who represented Tucker during the trial was assigned to the case in late April or May, 1985,[3] and first appeared of record at the May 17, 1985 pre-trial conference. The trial judge set August 13, 1985 as the firm trial date at that conference.

Shortly after taking over the case, trial counsel wrote to the prosecutor and requested a list of witnesses in order "to begin as soon as possible the interview process." After waiting approximately two weeks, defense counsel filed a motion for disclosure of "[t]he names and addresses of all persons whom the prosecutor will call as witnesses in the case in chief." On July 1, 1985, the trial court granted the motion and ordered the State to disclose its witnesses by July 5.[4]

When the State failed to provide its witness list by July 9, defense counsel filed a motion for sanctions, including "immediate disclosure under penalty of incarceration," for the prosecutor's failure to comply with Rule 15.1 and the subsequent court order. At the July 15 hearing on this motion, the State claimed that the witness list was "in the mail." Defense counsel intimated that he might require a continuance in order to interview all persons mentioned in the disclosed materials. The court criticized defense counsel for his penchant for filing motions and for "wait[ing] around to the 15th" before complaining about the State's failure to disclose.[5] The court told the parties that "[the trial] isn't going to be delayed one day," and ordered the State to hand-deliver a witness list by 5:00 p.m. that day, July 15, 1985.

Pursuant to this order, the State presented a list of 29 potential witnesses: 5 police ID technicians, 12 police officers, and 12 civilians. On July 26, Tucker filed a motion to continue the August 13th trial date and for sanctions. Tucker claimed that the prosecutor had intentionally sent defense counsel on a "fishing expedition" and "wild goose chase" in order to prejudice and interfere with counsel's investigation and trial preparation.

At the July 29 hearing on the motion, Tucker contended that the witness list included virtually every name mentioned in the previously disclosed police reports and that it was not a realistic list of the persons the State intended to call in its case-in-chief, as required by Rule 15. According to Tucker, the list included several persons only remotely connected to the case.[6] In

---

**2.** Rule 15, Ariz.R.Crim.P., 17 A.R.S. Hereinafter, these Rules will be cited as "Rule ____."

**3.** In total, three different public defenders represented Tucker during the pre-trial and trial proceedings: The first represented Tucker until January 1985, the second from late January to late April 1985, and the third from late April or mid-May continuing through the trial.

**4.** The motion for disclosure included a request for release of photographs and certain physical evidence for review and examination by experts. The trial court's Order also provided for disclosure of these items within a specific time frame; however, on appeal Tucker does not complain of any delay in disclosing this evidence.

**5.** Apparently, the trial court failed to recognize that counsel had filed its motion six days earlier.

**6.** Tucker complained that the list included the decedent's girlfriend who made no statement and whose only connection to the matter was her involvement with the deceased; this girlfriend's babysitter, whose only involvement was receipt of a telephone call from the police asking her to tell the girlfriend of the victim's death; the owner of the truck Tucker drove to the Stair residence; several police officers whose only involvement was to prevent bystanders from entering the crime scene; and five photographers, whose testimony is not re-

addition, Tucker asserted that this list, which was provided approximately one month before trial, was his first notice that the eyewitness Cole resided outside Arizona. Further, Cole could not be reached at the motel that was listed as his address.

Thus, Tucker argued that, because of the State's failure to disclose the witnesses for its case-in-chief, a continuance was necessary because defense counsel would not be able to interview each of the 29 potential witnesses in the 14 days remaining before the trial was scheduled to begin. Counsel also asserted that "appropriate representation" required a face-to-face interview with Cole, but a trip to New Jersey was "all but precluded" without a continuance because of the State's late disclosure and defense counsel's trial schedule.[7]

The State contended that Tucker's complaints about the witness list were "nothing but an artificial barrier," noting that defense counsel had already written to the 29 potential witnesses and had conducted some interviews and scheduled others. The prosecutor asserted that he disclosed "everybody" to prevent being accused of "hiding witnesses" and because he was unsure of the accused's defenses and the issues that might require rebuttal, such as the victim's violent character. In addition, the prosecutor noted that around July 19 he had received a written request to arrange an interview with Cole, but that defense counsel rejected an offer to accompany the State's investigator to New Jersey to try to locate and interview Cole because it was "not convenient."

The trial court was not persuaded that the State's disclosure was improper in not limiting itself to witnesses for the State's case-in-chief. The court also found that the list was not made in bad faith:

All I can assume, everybody is a lawyer in this Courtroom, nobody wants to waste everybody's time and they aren't going to disclose witnesses unless they think they might have to call them.

The trial court refused to continue the trial. Instead, the court asked defense counsel to identify the State's witnesses he would like to interview before trial. Counsel specified the eight potential witnesses, including Cole, that he had been unable to reach, plus "anyone else [the State] plans on calling." The court ordered the State to produce each of the in-state witnesses for interviews by 5:00 p.m., Friday, August 2, which was within the next four days, and was a week and a half prior to the trial. Further, the court ordered the State to set up a telephonic interview with Cole, if he could be found, and provided that defense counsel could take Cole's deposition prior to trial, if Cole was to testify.[8]

On the first day of trial, defense counsel again moved for an accurate list of the witnesses for the State's case-in-chief. The prosecutor named 12 witnesses.[9] During the trial, Tucker moved *in limine* to preclude the testimony of Donna Burwell, claiming she had not been disclosed prior to trial. Therefore, counsel claimed he was unprepared to question her because he had not conducted an interview or background check.

The trial court denied the motion to preclude Burwell's testimony without stating any reason, but provided that Tucker could interview Burwell before her testimony later that day. Defense counsel met with Burwell immediately before she took the witness stand. However, prior to her testimony, counsel again complained that he was not prepared to cross-examine Burwell because he had not had time to "check" her

quired as foundation in order to admit the photographs.

7. Defense counsel was scheduled to begin an unrelated trial for attempted murder on August 6, 1985, so he would be unavailable the week before Tucker's trial.

8. The State was unable to locate Cole until midtrial. We assume Tucker was afforded an opportunity to interview Cole before he testified; but in any case, Tucker does not complain on appeal that he was surprised or prejudiced by Cole's testimony.

9. Three of the 12 were not included on the 29-person list, and one did not testify at trial.

story.[10] The trial court permitted Burwell to testify and told counsel "you've got all weekend to talk to [the] people [Burwell mentioned in the interview]."

On August 19, 1985, the last day of trial, the State presented its Rule 15 disclosure —a list of 35 "potential" witnesses.[11]

### B. Analysis

Discovery in Arizona criminal trials is governed by both constitutional concerns and Rule 15 of the Arizona Rules of Criminal Procedure.

#### 1. Constitutional Right to Discovery

■ There is no general federal constitutional right to discovery in a criminal case. *Weatherford v. Bursey*, 429 U.S. 545, 559, 97 S.Ct. 837, 845, 51 L.Ed.2d 30 (1977); *see Pennsylvania v. Ritchie*, 480 U.S. 39, 55–63, 107 S.Ct. 989, 1001–04, 94 L.Ed.2d 40 (1987). As a general principle, the due process clause has "little to say" regarding the amount of discovery which the parties in a criminal trial must be afforded. *Wardius v. Oregon*, 412 U.S. 470, 474, 93 S.Ct. 2208, 2211–2212, 37 L.Ed.2d 82 (1973); *see also* Ariz. Const. art. 2, §§ 4, 24. However, the Constitution does impose on the prosecution a due process obligation to disclose exculpatory evidence that is material on the issue of guilt or punishment.[12] *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); *United States v. Bagley*, 473 U.S. 667, 676–684, 105 S.Ct. 3375, 3380–85, 87 L.Ed.2d 481 (1985). Under this doctrine, the defendant is denied a fair trial only if there is a reasonable probability that, had the exculpatory evidence been disclosed, the result of the proceeding would have been different. *Bagley*, 473 U.S. at 685–686, 105 S.Ct. at 3385.

■ Under the reasoning of *Brady* and its progeny, Tucker was not denied a fair trial by any nondisclosure or untimely disclosure of witnesses. Tucker does not argue, nor do we find any evidence in the record, that any of the witnesses were the source of exculpatory evidence. Indeed, each of the arguably untimely-disclosed witnesses, and especially Burwell, provided incriminating testimony. Therefore, the State had no constitutional duty to disclose any of these witnesses, so any untimely disclosure or nondisclosure did not violate constitutional precepts.

#### 2. Rules Violation
##### a. Discovery rules

The Arizona rules of criminal procedure impose broad pretrial disclosure requirements on the prosecution. Within 10 days of arraignment, the prosecutor is required to provide the defendant with the names,

---

**10.** Tucker's "complaint" was not formally presented as a motion either to continue the trial or to preclude Burwell's testimony:

"MR. PICCARRETA [Defense Counsel]: I just wanted to make a record. I've just completed my interview with Donna, and I understand she's going to be a witness now five minutes later, and I feel I am not prepared to cross-examine her, not having time to verify or check out her story or the truthfulness of her statement.

"THE COURT: Mr. Owen?

"MR. OWEN [Prosecutor]: The only person mentioned was her mother.

"MR. PICCARRETA: Her mother, George Stair, Janet Professori.

"Had an interview been conducted a few weeks ago—

"THE COURT: You know, you've got all weekend to talk to these people."

We treat counsel's argument as reurging his earlier motion *in limine* to preclude Burwell's testimony. However, even if we treat this argument as a motion to continue, the trial court's denial thereof would not constitute an abuse of discretion. As we hold, *infra*, defendant suffered no prejudice from the State's failure to include Burwell on its list of witnesses.

**11.** The list included all of the originally-disclosed 29 witnesses, plus six more. Of the six additional names, only one testified for the State. The 35–person list excluded two persons that testified for the State and included 22 persons that did not testify for the State.

**12.** We recognize that the sixth amendment's compulsory process clause also affords some discovery protections, but "conclude that compulsory process provides no greater protections in this area than those afforded by the due process clause." *Ritchie*, 480 U.S. at 56, 107 S.Ct. at 1001. We also note that the sixth amendment's confrontation clause has not been extended to require any pretrial disclosure. *Id.* (four-justice plurality concluded that the right of confrontation is a trial right and does not include the power to require pretrial disclosure of information that might be useful in contradicting unfavorable testimony).

addresses, and relevant written or recorded statements of all witnesses in the case-in-chief. Rule 15.1(a)(1). The prosecutor must also disclose the same information for its rebuttal witnesses after it receives the defendant's notice of defenses. Rule 15.-1(f).

If the prosecutor violates his disclosure duties, the court is authorized to impose "any sanction which it finds just under the circumstances, including, but not limited to" ordering disclosure; granting a continuance; holding a party, witness, or counsel in contempt; precluding a witness; or declaring a mistrial. Rule 15.7(a). The choices of whether to impose a sanction and which sanction to impose are left to the discretion of the trial court and will not be disturbed on appeal absent a showing of abuse. *State v. Fisher*, 141 Ariz. 227, 246, 686 P.2d 750, 769, *cert. denied, Fisher v. Arizona*, 469 U.S. 1066, 105 S.Ct. 548, 83 L.Ed.2d 436 (1984); *State v. Jessen*, 130 Ariz. 1, 4, 633 P.2d 410, 413 (1981). Generally, there is no abuse of discretion if the defendant suffers no prejudice. *State v. Fisher*, 141 Ariz. at 246, 686 P.2d at 769. In other words, even if there is a failure to remedy a discovery violation, a subsequent conviction will not be reversed on that account unless the defendant can demonstrate prejudice from the violation. *State v. Bracy*, 145 Ariz. 520, 529, 703 P.2d 464, 473 (1985), *cert. denied, Bracy v. Arizona*, 474 U.S. 1110, 106 S.Ct. 898, 88 L.Ed.2d 932 (1986).

*b. Application to witness list*

■ Clearly, the prosecutor violated the letter of Rule 15 by failing to provide the names, addresses, and statements of the witnesses-in-chief within ten days of Tucker's arraignment. More disturbing is the prosecutor's violation of the spirit of Rule 15 by failing to respond to defense counsel's written request for disclosure, by disregarding the trial court's order to provide a list of witnesses by a certain date, and by finally disclosing a witness list no more specific or helpful in identifying persons who would testify than the previously disclosed police reports. However, as much as we condemn the prosecutor's behavior in this case, we are unconvinced that Tucker suffered any prejudice as a result of this violation.

The crux of Tucker's complaint is that the prosecutor disclosed such a long list of witnesses so close to trial that a continuance was necessary to allow defense counsel to interview each of the potential witnesses in order to adequately prepare the case. We cannot agree. Although it is undisputed that the prosecutor presented his formal Rule 15 list of 29 potential witnesses 28 days before trial, the record is clear that Tucker's attorney was aware of these potential witnesses, through the State's previous disclosure, at least as early as defense counsel's June 7, 1985, letter requesting a list of witnesses from the prosecutor. Moreover, Tucker does not allege, nor do we find, that the prosecutor's late disclosure prevented him from interviewing any potential witness prior to trial or from discovering information which might have affected the verdict. Tucker had interviewed 21 of the State's potential witnesses as of the July 29th hearing on the motion to continue. The trial court ordered that all interviews desired by defense counsel be conducted no later than August 2, except for Cole, the out-of-state eyewitness, who was to be interviewed by telephone from New Jersey and then in person immediately prior to trial.

Tucker also claims that the prosecutor's late disclosure caused his counsel to spend his time immediately before trial interviewing witnesses rather than studying applicable laws and rules. This, he claims, resulted in his counsel's failure to make key objections and arguments. Even if counsel did fail as alleged, we do not agree that such failings were caused by the prosecutor's untimely disclosure. An attorney's lack of knowledge of substantive law or the rules of evidence cannot be attributed to an untimely disclosure of witnesses.

We hold that the trial court did not abuse its discretion in denying Tucker's motion to continue based on the prosecution's failure to comply with its duty to disclose its witnesses pursuant to Rule 15.1(a)(1).

### c. Application to undisclosed witness

Tucker complains that the trial court erred in allowing the State to present the testimony of an undisclosed witness, Donna Burwell.

Burwell was not one of the 29 potential witnesses disclosed by the State, nor was she one of the 12 persons the prosecutor named as witnesses for its case-in-chief on the first day of trial. However, the State claims that Burwell's name and the substance of her testimony were included in the police reports. Tucker does not dispute that Burwell was named in the police reports, but asserts that the police reports are not part of the record and that he is unaware of whether Burwell's statements appear in the reports. Tucker argues that even if Burwell's statements were included in the police reports, he was still surprised and prejudiced by the mid-trial disclosure that Burwell would testify because he had no reason to investigate the truth of her story, whether she was intoxicated on the night of the killing, or whether animosity existed between Burwell and either Tucker or Janet Professori (Tucker).

We have often stated that a witness should be precluded only as a last resort and only after considering how vital the precluded witness is to the proponent's case, whether the discovery violation was motivated by bad faith or wilfulness, whether the opposing party will be surprised and prejudiced by the witness's testimony, and any other relevant circumstances. *E.g., State v. Schrock,* 149 Ariz. 433, 437, 719 P.2d 1049, 1053 (1986); *State v. (Joseph Clarence, Jr.) Smith,* 123 Ariz. 243, 252, 599 P.2d 199, 208 (1979).

■ Based upon these considerations, the trial court properly allowed Burwell's testimony. Her testimony was important to the State's case. Burwell testified that on the night of the killing Tucker told her that he "just blew a guy away." Burwell also testified that she had overheard Tucker's telephone conversation with George Stair in which Tucker stated, "You know, Dad, nobody messes with my turf." Burwell was the only close friend of Tucker not to change her version of events at trial.

In addition, the facts do not suggest that the prosecutor purposefully or wilfully withheld Burwell's identity; rather the prosecutor was apparently negligent in delegating his disclosure obligations or in failing to check his subordinate's compilation of witnesses.

Most importantly, even assuming that Burwell's statements were not part of the police reports, we find that Tucker was not prejudiced by the State's failure to include Burwell on its Rule 15 list of witnesses. Prior to trial, Tucker knew of Burwell's existence and that she was at the Stair residence the night in question. Although the fact that Burwell would testify may have been a surprise, the content of her testimony was not. This is made clear by defense counsel's cross-examination of the witness. Counsel, in part through Burwell's prior inconsistent statements, impeached virtually all of the damaging testimony Burwell gave. For example, defense counsel impeached Burwell's testimony that Tucker said "I just blew a guy away." He pointed out that Burwell had, when talking with her mother on the night of the killing, attributed these words to Janet Professori and not to Tucker. Counsel also impeached Burwell with a statement, given to police on the night of the killing, in which she recapped all of the events of the evening. In this statement, she specifically responded to questions asking her to repeat everything Tucker had said on the night of the killing. Counsel emphasized that nowhere in this statement did Burwell say that Tucker claimed to have "blown a guy away."

Regarding the statement Burwell claimed she overheard Tucker make on the phone,—"You know, Dad, nobody messes with my turf"—defense counsel got Burwell to admit that she wasn't really listening to the phone conversation, and that she had no idea what subject Tucker was discussing, or to what questions he was responding.

In light of the quality and substance of the cross-examination of Burwell, it is clear that counsel was familiar with the content of Burwell's testimony. Although his in-

terview with Burwell was brief and immediately preceded her testimony, defense counsel had previously interviewed each of the persons mentioned in Burwell's testimony. He knew of Burwell's presence at the Stairs' house on the night of the murder and that she was mentioned in the police reports.

Therefore, we hold that the trial court did not abuse its discretion in denying Tucker's motion to preclude Burwell's testimony.

### 3. Prosecutor's Discovery Practices

Although we hold that Tucker was not prejudiced and his conviction stand despite the prosecutor's discovery rule violations, we strenuously disapprove of the prosecuting attorney's conduct. We are most concerned that it appears to be a common practice for the prosecution to list all persons named in the police reports as its Rule 15 disclosure. Rule 15 requires the prosecutor to make a good-faith attempt to identify its witnesses for its case-in-chief, as well as its rebuttal witnesses.

We have previously voiced our disapproval of the type of discovery practices exhibited in this case. *State v. Romero*, 130 Ariz. 142, 634 P.2d 954 (1981). We repeat our disapproval, this time mindful that appellate rebuke without reversal may amount to no more than an easily-ignored verbal spanking. While upsetting a criminal conviction is a drastic step, it is one we may in the future be required to take, pursuant to our inherent supervisory authority, if it is the only way to deter prosecutorial defiance of court rules.

Moreover, we note that it is the trial court's responsibility to enforce our disclosure rules. Trial court judges are far more able than we to ensure that prosecutors do not ignore their Rule 15 obligations. When necessary, trial judges possess the power to invoke sanctions—including holding *counsel* in contempt—for failure to comply with discovery rules. Rule 15.7(a)(3). Perhaps the time has come to make clear that these sanctions are not merely a paper tiger.

### III. DESTRUCTION OF EVIDENCE

Tucker argues that he was denied a fair trial because the State destroyed the partial latent fingerprints lifted from the handgun Janet turned over to the police.

Officer Cady, the identification technician who processed the gun, testified that she destroyed the prints after determining that they were of no forensic value. Cady did not notify Tucker or defense counsel prior to destroying the prints. Cady could not remember how many points of identification ("points"), if any, were present on the partial prints she destroyed, but she testified that she had never saved a partial print with less than three points. According to Cady, unless a print has four or five points, it is of no value either in making an identification or in excluding an individual from having left the partial print.

Cady also testified that it was the standard procedure of the Tucson Police Department (TPD) to allow an individual technician to destroy prints, without consulting another technician or a supervisor, upon concluding that the prints have no forensic value. The TPD does not have a procedure to photograph or otherwise save these prints because, according to Cady, there is not enough room to store them. The record is silent on whether it is TPD's policy to notify defendants or defense counsel prior to destroying fingerprints.

Tucker's expert, Charles Roth, testified that even when it is impossible to make an identification because the latent fingerprint has an insufficient number of points, it is possible to exclude a person from having left the print. According to Roth, only a print with no points is of "no forensic value"; a print that has even one point may be used to make an exclusion.

Roth also testified that if someone touched a smooth, metallic surface and the surface was tested within two days, he would expect to find the person's print on the surface, but he "would not be surprised if [he] did not find [a print]." Roth testified that a person may or may not leave a fingerprint after touching an object and that he had examined numerous items that had no latent prints despite having been

handled a day or two before. He testified that it would be easy, either intentionally or unintentionally, to wipe off fingerprints on a gun with a cloth.

At the time he testified, Roth had been doing latent print examination for 15 years, and his experience included employment with the Pima County Sheriff's Office as an Identification Technician, with the Arizona Department of Public Safety (DPS) as a Latent Print Examiner II, and as a private forensic consultant for the two years prior to trial. Roth testified that after a professional conference in 1979, DPS instituted a policy requiring two technicians to conclude that the print was of no forensic value before it could be destroyed. He also testified that after the conference it was his policy not to destroy any prints, even if he determined the print was of no forensic value.

■ At trial, the court gave a *Willits* instruction concerning the fingerprints.[13] *See State v. Willits*, 96 Ariz. 184, 393 P.2d 274 (1964). Despite this instruction, Tucker argues that the destruction of the latent fingerprints denied his due process right to a fair trial.

A necessary predicate to Tucker's claim is that the State has a duty to preserve partial latent fingerprints that have an insufficient number of points to make an identification because such prints may provide exculpatory evidence. *See Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The United States Supreme Court has held that "[w]hatever duty the Constitution imposes on the States to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense." *California v. Trombetta*, 467 U.S. 479, 488, 104 S.Ct. 2528, 2534, 81 L.Ed. 2d 413 (1984) (footnote and citations omitted). *See also State v. Beaty*, 158 Ariz. 232, 762 P.2d 519 (1988). To meet this materiality standard, evidence must both possess an

exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that defendant would be unable to obtain comparable evidence by other reasonably available means. *Trombetta*, 467 U.S. at 489, 104 S.Ct. at 2534. In the case at bar, the partial latent fingerprints that were destroyed did not possess exculpatory value; at most the prints had some forensic value in excluding the defendant from having left the prints. However, according to Tucker's own expert, the prints could not have excluded Tucker from having handled the gun, and certainly could not have excluded him from committing the crime. *See State v. Day*, 148 Ariz. 490, 715 P.2d 743 (1986) ("Due process [does not] require the police to preserve indefinitely evidence after a qualified technician has concluded that it has no probative value, so that an as yet unknown defendant may later make his own examination of the evidence.") (quoting *State v. Schilleman*, 125 Ariz. 294, 299, 609 P.2d 564, 569 (1980).

■ Even assuming the State had a duty to preserve the latent fingerprints at issue in this case, Tucker was not denied a fair trial. In reviewing whether a defendant has been denied a fair trial by the destruction of evidence, this court looks to the circumstances of each particular case. *State v. Wiley*, 144 Ariz. 525, 698 P.2d 1244 (1985). We have often stated that a defendant is not deprived of due process by the destruction of evidence unless the State has acted in bad faith or connivance or the defendant is prejudiced by the loss. *E.g.*, *State v. Day*, 148 Ariz. 490, 496, 715 P.2d 743, 749 (1986).

We find no evidence that the State acted in bad faith. Cady, a qualified technician, evaluated and destroyed the prints according to standard operating procedure. *See State v. Schilleman*, 125 Ariz. 294, 299, 609 P.2d 564, 569 (1980). In addition, we find no merit in Tucker's claim that the State destroyed the evidence because its investigation was focused on him. Al-

---

**13.** The court instructed:

If you find that the plaintiff, the State of Arizona, its agent or officers, have destroyed, caused to be destroyed, or allowed to be de-

stroyed any evidence whose contents or quality are at issue, you may infer that the true fact is against the State's interests.

though Tucker was a suspect at the time the police examined the prints, Cady testified that she was unaware of any prosecution when she destroyed the prints.

We also find that Tucker was not prejudiced by destruction of the latent prints. The best possible scenario for Tucker is that an examination of the partial latent prints would have excluded him from the set of persons whose prints were on the gun. However, as stated above, such an exclusion would not have excluded Tucker from ever having handled the gun and certainly would not exonerate Tucker of the alleged crime. As Tucker's expert explained, Tucker could have touched the gun, but not left a print, or the print could have been easily wiped off either intentionally or unintentionally through subsequent handling. We find no reasonable possibility that defendant was prejudiced by the destruction of the partial latent prints. *See State v. Day*, 148 Ariz. at 496, 715 P.2d at 749; *State v. Schilleman*, 125 Ariz. at 299, 609 P.2d at 569.

Moreover, under the *Willits* instruction, the jury could infer exactly what the destroyed evidence, at best, could have proved—that Tucker's prints were not on the gun. Under these circumstances, where the destroyed evidence would not exonerate Tucker, and where the *Willits* instruction provided the same benefit as any independent examination of the evidence, the *Willits* instruction protected Tucker's right to a fair trial.

Tucker argues that the *Willits* instruction was insufficient to protect his due process rights because another jury instruction contradicted the *Willits* instruction and because the prosecutor took unfair advantage of the lost evidence. In addition to the *Willits* instruction, the court instructed that "[n]either side is required ... to produce all objects or documents mentioned or suggested by the evidence." We disagree that the instructions are confusing. On their face the instructions deal with different issues: the production of evidence versus the consequence of destroying evidence. Furthermore, the instructions were not close to each other.

The trial court gave at least 31 paragraphs of jury instructions. The no-duty-to-produce instruction was contained in paragraph 8, while the *Willits* instruction appeared in paragraph 31.

Tucker also complains that the prosecutor used the loss of evidence against him in violation of *State v. Leslie*, 147 Ariz. 38, 708 P.2d 719 (1985). In *Leslie* the State failed to collect or test material spattered on the victim's car, but presented expert opinion testimony from the investigating police officer that the spots were blood. We stated that it is fundamentally unfair to allow the State to place reliance on the lost evidence as blood without allowing the defendant to inspect it in a manner which would allow for meaningful rebuttal. *Id.* at 47, 708 P.2d at 728. We held that it was reversible error to refuse the requested *Willits* instruction.

In contrast, the prosecutor here did not rely on evidence withheld from Tucker to inculpate him or contradict a defense theory. Fairly read, the prosecutor argued that the prints were inconclusive because Tucker could have touched the gun but not left a print and even if Tucker's print was found, Tucker could argue he had handled the gun previously.

Tucker also alleges that the prosecutor misled the jury and directly contradicted the *Willits* instruction by the following argument:

I'll simply say this fingerprint business, the property, all of this material is available, just like those police reports, just like all the material we disclosed to the defendant. All of this is available to them. Any time they want to have someone examine it, it's available here. We are not allowed to play guess what's behind my back, I'll show you at trial. It's there to be examined by them if they wish to do that. And if they do so and produce any contrary result, it is a piece of evidence.

In isolation, the prosecutor's comments seem offensive. However, a fair reading of the whole argument indicates that the references to evidence available for examination were meant to rebut defense coun-

sel's argument that the State failed to perform comparative tests on certain physical evidence. Any misconception created by the above comment was corrected by the prosecutor's later statements:

> Do not think for one moment I ask or expect of you to make any assumption or speculation based upon what I.D. Technician Cady said about that gun. She simply said, "I saw no forensic value. That could not be matched to anything."
>
> \* \* \* \* \* \*
>
> No one's print was on there, essentially, is what it means. We have no print evidence. That is about as important as if we had that print, as I mentioned before. That's why I drew the contrast between the two. We simply made a judgment, and that was it. We can't match it to anybody. If he's complaining we can't exclude the defendant, we've already done so. So there's no problem.

We hold that despite the State's destruction of the partial latent fingerprints, Tucker was given a meaningful opportunity to present his defense and was not denied a fair trial.

## IV. VOLUNTARINESS OF STATEMENTS

Tucker asserts that the trial court committed reversible error in admitting two statements he made to police officers after he was arrested. Tucker claims that his "extremely intoxicated" condition rendered the statements involuntary.

Confessions are prima facie involuntary, and the state must show by a preponderance of the evidence that the confession was freely and voluntarily given. *State v. Thomas*, 148 Ariz. 225, 714 P.2d 395 (1986). The trial court's determination that a confession was voluntary will not be disturbed on appeal absent clear error. *State v. Graham*, 135 Ariz. 209, 211, 660 P.2d 460, 462 (1983). However, the record must contain

evidence from which the appellate court can find that the state carried its burden of proof. *State v. Thomas*, 148 Ariz. at 227, 714 P.2d at 397 (citing *State v. Hall*, 120 Ariz. 454, 456, 586 P.2d 1266, 1268 (1978)).

In this case, the record reveals the following circumstances under which Tucker made the statements. Tucker was given *Miranda* warnings when he was arrested at the Stair residence at approximately 10:00 p.m. After the arrest, Officers Callahan and Sherwood transported Tucker to his apartment for questioning, to a field intoxilyzer machine that was ultimately not used, and eventually to the police station. At the station, Tucker took an intoxilyzer test, which registered a .22 blood alcohol level. After the test, Detectives Lowe and Gonzales conducted a taped interview with Tucker. Neither detective advised Tucker of his *Miranda* rights before beginning this interview, but at one point early in the questioning Gonzales asked Tucker if he remembered being advised of his constitutional rights at the Stair residence and if he wanted to be advised of them again. Tucker replied, "That's alright, ... forget it. I don't even [care]." The detectives asked Tucker for his "side" of what happened, telling him that Janet had given them the gun and a statement and that there was an eyewitness to the shooting. Tucker denied shooting anyone and after about 15 minutes asked for an attorney. The detectives immediately stopped questioning Tucker. The State played the tape of this interview *in rebuttal* to show that Tucker was not intoxicated.

About a half-hour after the interview, Officers Callahan and Sherwood drove Tucker to the county jail. The ride to the jail occurred at approximately 1:00 a.m. and took about 10 minutes. En route to the jail, Tucker described what he claimed to have happened that evening.[14] At the

---

**14.** Tucker gave the following version of events: Roper owed him $6,000 and had threatened to have Tucker killed if he did not stop trying to collect. Tucker and Roper met the victim at the Dream Street Bar; Tucker recognized the victim as a hit man from California. Roper and the victim were negotiating a cocaine deal. Tucker went to the restroom and returned to find Roper and the victim engaged in an argument that developed into a physical confrontation. Tucker walked out of the bar before the shot was fired and his girlfriend told him to get into the truck. Then they drove away.

hearing on the motion to suppress, Callahan testified that immediately before Tucker's statements, Sherwood was explaining to him the procedures that would be followed with Tucker because he, Callahan, was a "rookie" in training. However, Callahan testified that prior to Tucker's statements, he and Sherwood did not engage in any conversation with the intention of eliciting statements from Tucker. According to Callahan, during the ride to the jail Tucker said he liked the two officers better than others he had dealt with that evening and then began to talk about what had happened at the bar. Callahan said Tucker was very "talkative," both during the intoxilyzer test at the station and during the ride, presumably because Tucker took a liking to the officers after they had tried to shield Tucker from the press at the police station and had provided him with a cigarette while he was in a holding room. During Tucker's description of events, Sherwood asked Tucker a few questions "to clarify the story." At the hearing, Tucker testified that he "vaguely" remembered the ride to the jail, but he stated that the conversation was initiated by a question from Sherwood concerning what Roper was wearing. The State introduced Tucker's statements to Callahan and Sherwood in its case-in-chief.

Tucker claims that he was so intoxicated that his statements were involuntary.[15] We find the recent Supreme Court decision, *Colorado v. Connelly,* 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986), dispositive.

In *Connelly,* the Court held that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." *Id.* at 167, 107 S.Ct. at 522. In reaching this conclusion, the Court explained that "while [the defendant's] mental condition is surely relevant to an individual's susceptibility to police coercion, mere examination of the confessant's state of mind can never conclude the due process inquiry." *Id.* at 165, 107 S.Ct. at 521. The Court refused to establish a brand new constitutional right to confess to his crime only when totally rational and properly motivated. *Id.* at 167, 107 S.Ct. at 522.

Our review of the record reveals that Tucker's statements were not the product of coercive police tactics. There is no evidence or suggestion that the officers threatened, intimidated, or deceived Tucker. Tucker was not worn down by physical or psychological pressures exerted by the police. Although Tucker was under the influence of an intoxicant, after *Connelly* that alone is insufficient to render his statements involuntary. In the absence of police misconduct, Tucker's statements were voluntary. *Connelly,* 479 U.S. at 167, 107 S.Ct. at 522; *see also State v. Carrillo,* 156 Ariz. 125, 134–137, 750 P.2d 883, 892–95 (1988) (following *Connelly* ).

Nevertheless, *Connelly* recognizes that although a statement may be "voluntary" for due process purposes, the condition of a defendant may render his state-

---

At trial, Tucker testified to a different version of events.

**15.** The defendant does not claim that the statements he made while in the car were violative of his rights as set out in *Miranda.* Nor would such a claim be appropriate, because the statements, although made while in custody, were not made as a result of interrogation. The focus in ascertaining whether police conduct amounts to interrogation is on the intent of the police officers and the perceptions of the suspect. *See State v. Finehout,* 136 Ariz. 226, 230, 665 P.2d 570, 574 (1983).

Nothing suggests that the officers, through their discussion of police procedure, intended to elicit an incriminating response from Tucker. Further, the conversation concerned only police procedure, not the crime, and would not reason-

ably evoke incriminating statements. *See Rhode Island v. Innis,* 446 U.S. 291, 301–02, 100 S.Ct. 1682, 1689–90, 64 L.Ed.2d 297, 308 (1980); *see also Arizona v. Mauro,* 481 U.S. 520, 107 S.Ct. 1931, 95 L.Ed.2d 458 (1987), which stated that "[V]olunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today." *Id.* (quoting *Miranda v. Arizona,* 384 U.S. 436, 478, 86 S.Ct. 1602, 1630, 16 L.Ed.2d 694 (1966)). Although conflicting evidence was presented at the hearing on the motion to suppress, we are convinced that Tucker initiated the conversation while en route to the jail. Finally, Tucker did not argue, either in the trial court or on appeal, that the police improperly interrogated him after he invoked his right to counsel.

ments so unreliable that they must be excluded under the evidentiary laws of the forum. *Connelly*, 479 U.S. at 167, 107 S.Ct. at 522, 93 L.Ed.2d at 485. We thus consider whether Tucker's intoxication renders his statements so unreliable that they should have been excluded from evidence.

Our previous case law held that if a defendant was so intoxicated that he could not understand the meaning of his statements, then the statements were involuntary. *State v. Laffoon*, 125 Ariz. 484, 487, 610 P.2d 1045, 1048 (1980); *see also State v. Clabourne*, 142 Ariz. 335, 690 P.2d 54 (1984) (test for voluntariness when defendant is under influence of narcotics or mental disabilities is whether condition renders him unable to understand the meaning of his statement). We looked to the totality of the circumstances to determine whether the accused was able to reason, comprehend, or resist. *State v. Laffoon*, 125 Ariz. at 487, 610 P.2d at 1048 (1980). After *Connelly* and *Carrillo*, however, the question of voluntariness must focus on police conduct, and not solely on the mental state of the defendant. Nevertheless, we find the same analysis appropriate for determining whether the statements were so unreliable that they must be excluded.

Under the totality of the circumstances, we find that Tucker was able to understand the meaning of his statements. The evidence supporting this holding is overwhelming. At the interview with Detectives Lowe and Gonzales, Tucker was able to give factual information such as his name, address, height, etc. More importantly, Tucker was also able to question the detectives about Janet and request an attorney. We find that Tucker was clearly able to reason, comprehended what he was saying, and in fact resisted the detectives' efforts to get him to tell his "side" of the story.

The ride to the jail took place shortly after the interview. We find no evidence from which to conclude that Tucker's cognitive ability worsened or that he lost the ability to reason or understand the meaning of his statements during the ride to the jail. Although Tucker was sometimes difficult to understand, he related a coherent version of events during the ride. We find that Tucker was able to reason and comprehend when he made the statements.

Only two considerations point to a different conclusion. The police officers who came in contact with Tucker following his arrest formed differing opinions concerning his sobriety. The worst of these concluded that he was too intoxicated to drive a car. In addition, Tucker's blood alcohol level was .22 percent near the time he made both of the statements at issue. We find neither of these conditions demonstrates that Tucker was unable to understand the meaning of his words.

Therefore, we hold that Tucker's statements were "voluntary" within the meaning of the due process clause of the fourteenth amendment and were not obtained in violation of his fifth amendment rights. Moreover, the statements were not so unreliable that they should have been excluded from evidence.

## V. JURY INSTRUCTIONS

Tucker contends that the trial court committed reversible error both in refusing to give a "motive" instruction and in refusing to give a manslaughter instruction.

### A. Motive Instruction

Tucker requested the following instruction, which the trial court refused:

Motive is not an element of the crime charged and need not be shown. However, you may consider motive or lack of motive as a circumstance in this case. Presence of motive may tend to establish guilt. Absence of motive may tend to establish innocence. You will therefore give its presence or absence, as the case may be, the weight to which you find it to be entitled.

 This court has held that the presence or absence of motive is relevant in a murder prosecution and that a proper motive instruction should be given upon request. *State v. Hunter*, 136 Ariz. 45, 50, 664 P.2d 195, 200 (1983); *accord State v. Ferguson*, 149 Ariz. 200, 212, 717 P.2d 879, 891 (1986). We do not agree with the State

that a motive instruction is warranted only where the State concedes at trial that the defendant had no motive to kill the victim. We find that the proffered instruction was a complete and correct statement of the law and that the court's failure to give the instruction was error.

However, we do not believe that the court's failure to instruct the jury on motive denied Tucker a fair trial. We are not faced with an incomplete instruction that may have misled the jury "into thinking that motive or lack of motive is of no significance." *Hunter*, 136 Ariz. at 50, 664 P.2d at 200. As in *Ferguson*, refusing the instruction here did not prevent Tucker from presenting evidence and arguing about motive. In fact, Tucker testified that he had no motive to shoot the victim, and defense counsel argued lack of motive as circumstantial evidence that Tucker did not shoot the victim and that there was no premeditation. Also like the defendant in *Ferguson*, Tucker's theories were adequately covered in the court's instructions on first-degree murder, especially premeditation. In addition, we disagree with appellant that the extensive, conflicting evidence about motive and lack of motive confused or misled the jury in the absence of a motive instruction.

### B. Manslaughter Instruction

Although the jury was instructed on first-degree and second-degree murder, Tucker claims the trial court committed reversible error in failing to instruct the jury on manslaughter as a lesser-included offense.

In a death penalty case, the trial court is required to instruct the jury on all lesser-included offenses supported by the evidence, even if not requested by the defense. *Beck v. Alabama*, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980), *explained in Hopper v. Evans*, 465 U.S. 605, 611–14, 102 S.Ct. 2049, 2053–54, 72 L.Ed.2d 367 (1982); *State v. Clabourne*, 142 Ariz. 335, 345, 690 P.2d 54, 64 (1984); *Vickers v. Ricketts*, 798 F.2d 369 (9th Cir.1986), *cert. denied, Ricketts v. Vickers*, 479 U.S. 1054, 107 S.Ct. 928, 93 L.Ed.2d 980 (1987). Man-

slaughter is a lesser-included offense of first-degree murder, *State v. White*, 144 Ariz. 245, 247, 697 P.2d 328, 330 (1985), and the trial court should have given a manslaughter instruction if the evidence at trial would have supported a manslaughter conviction.

Assuming, without deciding, that the court erred in refusing to instruct on manslaughter because the record supported such an instruction, the error is harmless beyond a reasonable doubt. Where the jury is instructed on both first- and second-degree murder and returns a first-degree murder conviction, there is no prejudice for failure to instruct on manslaughter. *State v. White*, 144 Ariz. at 247, 697 P.2d at 330 (jury necessarily rejects all lesser-included offenses by convicting on highest offense).

In this case, Tucker would have been guilty of manslaughter if he recklessly caused another person's death or committed second-degree murder upon a sudden quarrel or heat of passion resulting from adequate provocation. *See* A.R.S. § 13–1103(A)(1), (2). By returning a first-degree murder conviction, the jury found that Tucker killed Broussard with premeditation, and therefore necessarily rejected the idea that Tucker acted recklessly. In addition, because the jury did not find Tucker guilty of second-degree murder, a manslaughter conviction based on second-degree murder committed upon adequate provocation was precluded. On the facts of this case, we find that the absence of the lesser-included-offense instruction on manslaughter could not have enhanced the risk of an unwarranted conviction. *See Beck v. Alabama*, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980). We hold that Tucker was not denied a fair trial by the court's refusal to instruct on manslaughter.

### VI. QUESTIONING ABOUT PAROLE STATUS

The trial court denied Tucker's motion to preclude impeachment with his prior convictions for theft and forgery. Tucker testified in his own behalf and admitted his prior convictions on direct examination.

On cross-examination, the prosecutor questioned Tucker not only about his prior crimes, but also about his parole status:

Q. [Prosecutor] Now, your prior conviction is for forgery and grand theft; is that right?

A. [Tucker] Yes.

Q. I believe you said in your testimony something like, "I've been out of the [sic] trouble, and I didn't want any part of that," talking about what was going on at the bar; is that right?

A. That's correct.

Q. You were on parole at that time?

A. No, I was not.

Q. You had absconded from parole?

The objection to the last question was sustained, and the prosecutor did not ask any further questions about either Tucker's prior convictions or his parole status.

Tucker asserts that the prosecutor is guilty of misconduct which denied him a fair trial. Tucker argues that the prosecutor's questions exceeded the permissible scope of impeachment with prior convictions, constituted inadmissible character evidence, and was improper impeachment with prior misconduct. *See* Rules 609, 404, 608, Ariz.R.Evid., 17A A.R.S. Tucker asserts that this impermissible questioning was sufficiently prejudicial to warrant reversing his conviction.

 Under Arizona law, impeaching a witness with a prior felony conviction is limited to showing the fact of the conviction, the name of the crime, the place, and the date. *E.g., State v. Sorrell,* 85 Ariz. 173, 333 P.2d 1081 (1959); *State v. Price,* 123 Ariz. 197, 598 P.2d 1016 (App.1979), *rev'd on other grounds,* 123 Ariz. 166, 598 P.2d 985; *see generally* M. Udall & J. Livermore, *Arizona Law of Evidence* § 47 (1982). It is the fact of conviction, not the extent or terms of the punishment, that is probative of the witness's veracity. Thus, questioning Tucker concerning his parole status was improper impeachment pursuant to Rule 609, Arizona Rules of Evidence.

We do not believe, however, that this error requires reversal. Tucker's previous convictions for theft and forgery were properly before the jury and available to discredit his veracity. Any suggestion that Tucker might have violated the conditions of his parole is only minimally more detrimental to his credibility than the fact of his convictions. The prosecutor did not pursue the parole issue after the defense objection, and no mention of parole or absconder status was made in either opening statements or closing arguments. The issue was not emphasized to the jury, and the jury was instructed that Tucker's prior convictions were probative only of his truthfulness and not as evidence that he committed the murder, had a bad character or a disposition to commit crimes. In addition, the jury was instructed to disregard any question where an objection had been sustained and not to guess at the answer. Therefore, we find that the erroneous questioning was harmless beyond a reasonable doubt.

We have searched the record for fundamental error according to the mandate of A.R.S. § 13–4035 and have found none. Accordingly, the judgment of conviction and the sentence is affirmed.

FELDMAN, V.C.J., and CAMERON and HOLOHAN, JJ., concur.

Note: Justice JAMES MOELLER did not participate in the determination of this matter.